18 A.3d 1

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Norman Christopher USIAK.

Misc. Docket AG No. 22, Sept. Term, 2009.

Court of Appeals of Maryland.

April 25, 2011.

668

**670**

Dolores O. Ridgell, Asst. Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

Norman Christopher Usiak, Frederick, Maryland, for respondent.

Submitted to BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

Pursuant to Maryland Rule 16–715,[1] the Attorney Grievance Commission of Maryland ("Petitioner"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Norman C. Usiak ("Respondent"), charging him with professional misconduct arising out of his representation of Ruben Paz–Rubio in the District Court of Maryland, sitting in Frederick County. Petitioner charged Respondent with violating Rule 8.4(d) (Misconduct)[2] of the Maryland Rules of Professional Conduct ("MRPC"). In accordance with Maryland Rule 16–752(a)[3], we referred the matter to the Honorable Durke G. Thompson, of the Circuit Court for Montgomery

---

1. Maryland Rule 16–751 provides in relevant part:
 (a) **Commencement of disciplinary or remedial action.** (1) Upon approval of Commission. Upon approval of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. MRPC 8.4(d) provides:
 It is professional misconduct for a lawyer to:
 * * *
 (d) engage in conduct that is prejudicial to the administration of justice;

3. Maryland Rule 16–752(a) provides:
 (a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing.

County, to conduct an evidentiary hearing and to render findings of fact and recommend conclusions of law. In response to our request, Judge Thompson held an evidentiary hearing on June 10–11, 2010 and rendered the following findings of fact and conclusions of law.

### Findings of Fact

Respondent represented Ruben Paz–Rubio ("Paz–Rubio") who was charged with driving without a license. On May 15, 2008, Respondent represented Paz–Rubio at his trial in the District Court of Maryland before the Honorable Janice Rudnick Ambrose. The State was represented by Assistant State's Attorney Jacob Craven ("Prosecutor"). On the morning of trial, Respondent and the Prosecutor made a joint motion for a continuance. The reason given to the court by Respondent for the continuance request was that Respondent did not wish to proceed with trial until after his client obtained a valid Maryland driver's permit. The Prosecutor explained to the court that it agreed to the postponement because the State had not provided requested discovery to Respondent and his client until the day before the trial. Judge Ambrose denied the motion for a continuance, but agreed to the State's request to pass the case and move it to the afternoon docket. Judge Ambrose pointed out:

> COURT: I'm not postponing this case. This case is four months old, and there's already been one postponement for the defense and discovery is not really grounds for a postponement. Now, if you want this afternoon, I'll let you set it—I'll set it in the afternoon, but I'm not postponing it for MVA appointments.

Although the trial judge made her ruling, Respondent did not relent. According to Respondent:

> MR. USIAK: But, we have a right to our discovery. Your Honor.
>
> COURT: Well, I don't—Mr. Usiak that may be, but that's not a reason for postponement—
>
> MR. USIAK: Sure it is.

COURT: And I'm not postponing it. So if you want to pass the case, fine.

MR. USIAK: Sure.

STATE: If we may pass the case Your Honor.

COURT: Do we have, do we have motor vehicle this afternoon?

CLERK: Yes, we do. It's a very (unclear words).

COURT: If you want, I'll reset it for the afternoon, that should give you ample time to review. It's not that complicated of a case, I wouldn't think.

MR. USIAK: Thank you.

COURT: Thank you.

After Judge Ambrose heard some other matters on her morning docket, the State recalled the Paz–Rubio case. The Prosecutor moved, "based on evidentiary issues," to place the case on the stet docket[4] upon the condition that Paz–Rubio provide proof of obtaining a license within 60 days, that he complete 24 hours of community service, and obey all laws. Judge Ambrose stated that she did not normally accept a stet "unless [defendants charged with driving without a licence] have a driver's license"[5] and asked the Prosecutor to elaborate on the nature of the evidentiary problems.

---

**4.** Rule 4–248 governs the disposition of a criminal charge by stet. The Rule provides:

(a) **Disposition by stet.** On motion of the State's Attorney, the court may indefinitely postpone trial of a charge by marking the charge "stet" on the docket. The defendant need not be present when a charge is stetted but in that event the clerk shall send notice of the stet to the defendant, if the defendant's whereabouts are known, and to the defendant's attorney of record. A charge may not be stetted over the objection of the defendant. A stetted charge may be rescheduled for trial at the request of either party within one year and thereafter only by order of court for good cause shown.

(b) **Effect of stet.** When a charge is stetted, the clerk shall take the action necessary to recall or revoke any outstanding warrant or detainer that could lead to the arrest or detention of the defendant because of the charge, unless the court orders that any warrant or detainer shall remain outstanding.

**5.** Paz–Rubio had attempted to get a license before trial, but was not successful.

Respondent interjected and stated that he had no objection to the Prosecutor's motion and asked to be excused. Judge Ambrose replied "[n]o you may not. This case is being heard Mr. Usiak. I'm asking the Prosecutor a question."

MR. USIAK: I object to the question Your Honor.

COURT: Well you can object if your want—

MR. USIAK: According to the Rule, I believe it's, I believe it's a decision by the Prosecutor—

COURT: I think it's a decision by the Court—

MR. USIAK: To enter a stet—

COURT: To grant the stet, it's a motion.

MR. USIAK: Not when it's not objected to by the defense Your Honor.

COURT: No Mr. Usiak, you are wrong.

MR. USIAK: No.

COURT: Mr. State?

STATE: Your Honor it would be based on the stop in this case. It's an interesting set of facts—

MR. USIAK: If we may be excused Your Honor?

COURT: No Mr. Usiak, this case is being heard.

MR. USIAK: I mean no disrespect to you.

COURT: Well you're being disrespectful.

MR. USIAK: Well I don't mean to be.

COURT: We are not concluded yet Mr. Usiak.

MR. USIAK: I am Your Honor and I believe that the State—

COURT: Mr. Usiak the—

 Respondent went on to say that he believed that the case was concluded by the Prosecutor making the motion to stet the case. Judge Ambrose told the Prosecutor that if the State wanted to *nol pros* the case it could, but that she was not granting the motion to stet.[6] The Prosecutor declined to

---

**6.** "A *nolle prosequi*, or *nol pros*, is an action taken by the State to dismiss pending charges when it determines that it does not intend to

*nol pros.* When Judge Ambrose asked Respondent for Paz–Rubio's plea, Respondent replied "we believe that the case has been stetted." The colloquy continued:

COURT: This case has not been stetted Mr. Usiak unless you are rewriting the rules—

MR. USIAK: The appropriate mechanism—

COURT: Unless you are rewriting the rules, the Court's not granting the stet. So the State—the case is open—

MR. USIAK: It is not within the providence of the Court.

COURT: It is the Court's providence Mr. Usiak. I think you better sit down and read the rules.

MR. USIAK: No Your Honor I, I, we're leaving. Your Honor. Excuse me.

COURT: We are going to pass this case until you decide what to do. The case is passed. It is not off the docket Mr. Usiak. Sir have a seat in the courtroom. Mr. Usiak, your client is staying the case is not concluded. You can hear me. You're in contempt.

For the record, Counsel for the Defendant has walked out of the courtroom while the case was not concluded simply passed for a decision; that's under Rule 15–203. This case is not over Mr. Craven [the prosecutor].

STATE: Thank you your Honor.

Through an interpreter, Paz–Rubio was instructed by the court to remain in the courtroom because the case was not over. Respondent, however, left the courtroom without his client. The Court, in the meantime, heard other cases and then, after recess, recalled the case. When Judge Ambrose, after recalling the case, received no response from either Respondent or Paz–Rubio, she announced that Respondent, by electing not to return to court, was in contempt. Respondent

---

prosecute the defendant under a particular indictment." *State v. Huntley,* 411 Md. 288, 291 n. 4, 983 A.2d 160, 162 n. 4 (2009) (citing *Ward v. State,* 290 Md. 76, 83, 427 A.2d 1008, 1012 (1981)). Unlike a motion to stet a case, no motion requiring approval by the court of the State's decision to *nol pros* a matter is required.

was sanctioned and fined $250.00. In addition, Judge Ambrose issued a bench warrant for Paz–Rubio's arrest and set a bond at $500.00.

Judge Thompson, the hearing judge in this disciplinary proceeding, outlined the facts that led to his conclusion that Respondent disrupted the proceedings by walking out of the courtroom if Judge Ambrose did not grant the stet. He found by clear and convincing evidence that "following [Judge Ambrose's] denial of the motion to continue [the trial,] the Respondent and Prosecutor Craven again discussed the resolution of the case." These discussions occurred in the courtroom while the courtroom was recessed, but other members of the public were present. The Prosecutor expressed that he did not expect that the motion to stet the case would have been granted because of Judge Ambrose's practice of not granting a stet where the charge is driving without a license and the defendant had not obtained a valid driver's permit by the time of his trial date. The Prosecutor, nonetheless, agreed to request the stet, "but wanted to know what was to happen if Judge Ambrose did not grant the disposition of the stet docket." According to Respondent, in response to the Prosecutor's concern, "if the motion were made and there was no objection by the defendant, the Court was obligated to grant the motion." Clearly, Respondent wanted "his client to obtain his driver's permit within 30 days and asked for the stet or a nolle prosequi of the case." Respondent confirmed his plan when he explained to the Prosecutor, "you make the motion to stet the case. I'll tell the Judge we don't object and I'll take it from there." According to Respondent's own testimony before Judge Thompson, Respondent's intention was, "I'll accept the stet, and if need be, I'll walk out on [Judge Ambrose]."

The Prosecutor explained to Respondent that the State would not enter a *nol pros* because the police officer was present and ready to testify. Respondent wanted, however, for his client to receive the benefit of either a *nol pros* or a stet, so Respondent used what he described as a tactic to shame and /or embarrass the Prosecutor. Because the Prose-

cutor was relatively inexperienced, during the court recess, Respondent spoke to him in a loud and forceful tone using what he described as "colorful" language.[7]

Despite Respondent's tactics during the court recess, at no time did the Prosecutor suggest that Respondent walk out on the proceedings if the motion for a stet were denied. According to the Prosecutor, Judge Ambrose's instructions to Respondent and his client to remain in the courtroom and that the case was not over were loud enough for Respondent to hear. Judge Thompson found that "Respondent was in the midst of his dialogue with the court when he left the courtroom despite being told that he was not excused, that Paz–Rubio was directed to remain and the case was not concluded." Further, according to Judge Ambrose, "she told Respondent, '[y]our client is staying and the case is not concluded,' while Respondent was heading for the door of the courtroom, some 40 feet distant. As he reached the door, Respondent turned and ... looked at her while she was saying, "[y]ou can hear me. You're in contempt." Although Respondent acknowledged that he turned toward the judge as he reached the doorway, he maintain[ed] that it was "only for the purpose of looking for his client." After having listened to the taped recording of the proceedings before Judge Ambrose, Judge Thompson concluded that "Judge Ambrose's statements to Respondent and Paz–Rubio could be clearly heard." This finding was consistent with the testimony of the Prosecutor, who said, "Judge Ambrose spoke loudly at that moment."

Respondent admitted to Judge Thompson that he waited outside the courtroom until recess to talk to Paz–Rubio to give him the option of continuing the attorney-client relationship and leaving the courtroom or staying and being represented by a lawyer that Respondent would find at no cost to Paz–Rubio. According to Respondent, he counseled his client and recommended that Paz–Rubio not return to Judge Ambrose's

---

7. In later testimony, Respondent said that although he used profanity, his tone with the Prosecutor "was much more moderate and less confrontational."

courtroom, although contrary to the court's instructions, "and instead, accompany Respondent to his office and start working on a petition for a writ of habeas corpus." [8] As a result, "Paz–Rubio followed Respondent's advice and did not remain in the courthouse to complete the hearing." Respondent testified that he gave this advice even though he really believed that Judge Ambrose would accept the stet disposition eventually, and thus revealed he did not believe leaving the courtroom was the only way to protect his client.

In an effort to obtain review of the District Court contempt ruling, Respondent filed a petition for a writ of certiorari in the Circuit Court for Frederick County. The action was titled Paz–Rubio versus Judge Ambrose. Paz–Rubio's case on the traffic charge was rescheduled for trial to be held on August 8, 2008. Respondent again attempted to delay the disposition of the case by advising Paz–Rubio not to attend the August 8 trial so that Respondent's "petition for certiorari, filed in the Circuit Court, would not become moot" in an effort for Respondent to argue his "position on the stet question." Only after a second bench warrant was issued for Paz–Rubio on August 8, 2008, did Respondent agree to accept the State's final offer to *nol pros* the charges against Paz–Rubio.

Eventually, the petition for certiorari was dismissed by the Circuit Court as moot. Respondent appealed the contempt finding to the Circuit Court for Frederick County, which vacated the finding of contempt and remanded the matter back to the District Court on the grounds that the initial order of the District Court failed to comply with Rule 15–203. Thereafter, the District Court issued a new order finding Respondent in direct contempt.

Respondent appealed the second order to the Circuit Court and that order was affirmed. Thereafter, Respondent "appealed to the Court of Special Appeals, which, on its own motion, transferred the appeal to this Court pursuant to Rule

---

8. Respondent believed that if Paz–Rubio, apparently an undocumented immigrant in the United States, pleaded guilty he would be deported.

8–132" because the intermediate appellate court did not have appellate jurisdiction to consider the case. *See Usiak v. State,* 413 Md. 384, 393–94, 993 A.2d 39, 44 (2010). We granted Respondent's subsequent petition for *certiorari* and reversed the judgment of the Circuit Court because the summary order of direct criminal contempt that was issued did not comply with Rule 15–203 and could not be re-issued as corrected on remand. *Usiak v. State,* 413 Md. at 403, 993 A.2d at 50–51.

## Conclusions of law

Judge Thompson concluded that Respondent "heard and could appreciate the direction and comment of Judge Ambrose." Citing *Attorney Grievance Commission v. Mahone,* 398 Md. 257, 920 A.2d 458 (2007), the hearing judge found by clear and convincing evidence that Respondent's conduct violated Rule 8.4(d) of the Maryland Rules of Professional Conduct. Respondent's conduct before Judge Ambrose was "a calculated response to an expected court ruling. He discussed the very actions he intended to take with the prosecutor, whom he strongly urged to cooperate. The only uncertainty of the event was the chance that Judge Ambrose might agree to the motion made by the State to stet the charges." Respondent's action of walking out of the courtroom delayed resolution of his client's case even though the delay eventually worked to his client's advantage.

Further, Judge Thompson, concluded that "Respondent's conduct was in pursuit of his [own] legal philosophy as opposed to his clients interests," and resulted in a "waste of the time of clerical personnel, the time of the State's Attorney, and the Court." Moreover, Judge Thompson determined that Respondent's behavior constituted "a breach of ethical responsibility" to his client resulting in a bench warrant being issued for Paz–Rubio and probably "anxiety, uncertainty, and bewilderment" to his client. The hearing judge noted that "Respondent subordinated his responsibility to this client to his own desire to 'make a statement' by leaving the courtroom and advancing Respondent's agenda of showing Judge Ambrose that he was correct about the entry of a stet disposition."

Although Respondent argued that he believed his conduct "was acceptable as long as it was taken in good faith and supported in law," the hearing judge concluded that "Respondent ha[d] not proven by a preponderance of the evidence that there [wa]s a defensible or excusable reason for his conduct." Although the hearing judge pointed out that Respondent's conduct in this case appears to be an isolated event, however, by acting as he did, "Respondent misapprehended his role in the courtroom." Rather than "[a]sserting a right for the 'benefit' of the State," clearly "Respondent should have been doing what was possible and ethical to obtain the best result for his client."

Judge Thompson also made findings of fact as to mitigation. He concluded:

### Mitigation

Prior to the events of May 15, 2008, there was history between Judge Ambrose and Respondent. It undoubtedly, but should not have, played a role in the incident. The Respondent appears to have wanted to prevail over Judge Ambrose personally. While there is evidence of the Respondent's manner of conducting himself, mostly from his own testimony, the conduct of the Respondent appears to be an isolated event.

It appears that Respondent was trying to make a point in Court by the use of improper means. As such, the conduct is neither corrupt nor immoral. The character of the conduct was annoying and disrespectful, and evinces a lack of confidence in the judicial process.

The Respondent's character reflects an interest of championing the rights of defendants by fighting for and winning points of law that he believes are right. While this is an admirable trait, such conduct is problematic when it runs contrary to the client's interests and the needs of the judicial system to fairly administer justice. The character of the conduct seems in the nature of "tilting at windmills" rather than zealously protecting the rights and interests of his client. Witnesses called by the Respondent included

Jack Bloomquist, Esq., who described the Respondent as earnest almost to a fault, and zealous in his advocacy. Bloomquist opined that Respondent considers the law sacred. He was described as religious, very devout and highly principled. At the same time, Bloomquist recognized that Respondent had weaknesses in his courtroom style and could be over zealous when subtlety might be helpful and more persuasive. In other words, sometimes the Respondent tended to "go over the top" in his representation.

The Respondent presented testimony that his conduct was ethical and consistent with his professional obligations and responsibilities to his client. In his testimony, he essentially argued that his conduct was acceptable as long as it was taken in good faith and supported in law. In this regard, Respondent testified that he contacted William Poffenberger, Esq., a respected criminal law practitioner, and asked him, "Do you believe that entry of a stet with the consent of the defendant is a termination of the prosecution?" Respondent described this as a "loaded question" to which Respondent received the answer of "yes." Poffenberger was also called by the Respondent who said, "I believe it was a termination but I didn't believe that the other side believed that." Poffenberger explained that the "other side" was referring to judge or judges of the courts. Poffenberger denied that he told Respondent that the Court did not have the right or the authority to deny a motion for a stet, that Respondent should not go back into the courtroom to finish the matter, or suggesting any other course of conduct to the Respondent.

In summary, by discussing with the prosecutor in advance his intent to walk out on the court proceedings, by conducting himself consistent with his representations to the prosecutor and disregarding the explicit directions of the Court to Respondent and his client, and further acting to advance his personal legal beliefs contrary to the interests of his client violated the Rules of Professional Conduct. Respondent, in essence, told the prosecutor to play his role in allowing Respondent to challenge the actions of the Court in order to

allow himself the opportunity to fall upon his sword in support of a misperceived legal right. Having fallen upon his sword, Respondent now complains that falling on his sword has painful consequences. He is now accountable in these proceedings for his conduct.

## DISCUSSION

### Standard of Review

■ Recently, in *Attorney Grievance v. Lara*, 418 Md. 355, 14 A.3d 650 (2011), we reiterated that "[t]his Court has original and complete jurisdiction over attorney discipline proceedings in Maryland." Although we review the record independently, we accept the hearing judge's findings of fact unless we determine that they are clearly erroneous. *Attorney Grievance v. Guida*, 391 Md. 33, 50, 891 A.2d 1085, 1095 (2006). We review the hearing judge's conclusions of law de novo. Rule 16–759(b)(1) (providing that "[t]he Court of Appeals shall review de novo the circuit court judge's conclusions of law."); *Attorney Grievance v. Thomas*, 409 Md. 121, 147, 973 A.2d 185, 201 (2009).

### The Exceptions and Recommended Sanctions

■ Petitioner did not file exceptions to the hearing judge's findings or conclusions of law, however, Respondent did file exceptions [9] and a supplement to those exceptions. As

---

9. Bar Counsel filed in this Court a Motion to Strike portions of Respondent's written exceptions, specifically, his reference to the Peer Review Panel proceedings, the admission into evidence and reference to irrelevant newspaper articles, Respondent's suggestions that the testimony of a witness was "rehearsed and guarded" and that the transcript of that "testimony [was] edited—for no other reason than [the witness's] protection." In turn, Respondent filed, what he entitled a "Response to Petitioner's Motion To Strike." In his response, Respondent maintains that his references to the Peer Review Panel proceedings were made for purposes of comparing what the Peer Review Panel found from the facts presented to it and what the hearing judge deduced from the facts presented to him. As to the newspaper articles, Respondent asserts that articles relating to the Frederick County Sheriff were admitted into evidence, although for a limited purpose, and were

to sanction, Petitioner recommends that we impose a 60–day suspension because Respondent engaged in conduct that was both disruptive and prejudicial to the administration of justice. To the contrary, Respondent does not believe that his conduct is sanctionable because, in Respondent's view, his intent and efforts were always to protect his client from a prosecution that would have been contrary to the law. Thus, according to Respondent, we should refer his case back to a Peer Review Panel for its further consideration.

As to Respondent's written exceptions to Judge Thompson's findings of fact and conclusions of law, he first contends that the professional misconduct, alleged to have occurred, never happened. In addition, he asserts that he has been "deprived of his opportunity to present a defense and Due Process." Further, Respondent maintains that he never provided a

---

relevant. As to other newspaper articles concerning Judge Thompson, Respondent maintains that the articles are relevant "to supply a credible explanation for Judge Thompson's disregard of relevant and unchallenged evidence" presented at the Circuit Court disciplinary hearing. Respondent does not mention, in that submission to this Court, that the newspaper accounts concerning Judge Thompson were never offered nor admitted into evidence. Finally, as to the testimony of a witness called to testify at the disciplinary hearing, Respondent claims that the witness was not credible and that the transcript of the witness's testimony must have been altered. According to Respondent, he remembers the witness's testimony differently and that there appears to be a gap in the transcript where the alleged testimony that was not transcribed should have been.

Portions of the Respondent's exceptions shall be stricken. As we shall explain in our discussion of each of the exceptions, the exceptions are overruled for the reasons stated herein. The newspaper articles referring to Judge Thompson are stricken from the record. The articles were neither offered nor admitted into evidence at the hearing and are not relevant for purposes of our review of the disciplinary proceedings in this case. The references to the Peer Review Panel proceedings are also stricken. We have explained in several cases the Peer Review Panel proceedings are informal, confidential and privileged. *AGC v. Kinnane*, 390 Md. 324, 338, 888 A.2d 1178, 1186–87 (2005); *AGC v. Lee*, 387 Md. 89, 108, 874 A.2d 897, 909 (2005); *See* Rule 16–723(a). We have said that "Peer Review Panel Reports [are insulated] from subsequent disclosure at later stages of the attorney discipline process." Thus, the evidence that was presented to the Peer Review Panel, and its assessment of that evidence, is irrelevant to our review of the evidence presented at Respondent's actual disciplinary evidentiary hearing.

disservice to his client and the allegation that he "engaged in conduct intended to be wasteful of judicial resources was never charged." In support of his argument that the Petition does not mention he wasted judicial resources, Respondent refers to paragraph 11 of the Petition for Disciplinary or Remedial Action, which alleges that "[d]uring the proceedings, Respondent was advised by the Court that he was to return with his client for a hearing later in the day[,]" and paragraph 12, which alleges that "Respondent failed to comply with the Court's direction."

In its response to the first exception, Bar Counsel points out that, based upon the allegations contained in the Petition filed in this case, "Respondent was on notice that he needed to defend against the allegation that he did not comply with the Court's direction and that he was not free to leave the courtroom or excused from the rest of the hearing." In addition, Bar Counsel asserts that, the Petition alleged misconduct related to Respondent's actions on May 15, 2008, and his representation of Paz–Rubio, wherein Respondent interrupted the proceedings, disrespected the trial judge and left the courtroom before the proceedings had concluded. The specific charge contained in the Petition was a violation of MRPC 8.4(d): "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice . . . ."

■ Respondent does not contend that Judge Thompson's factual findings were clearly erroneous. *See AGC v. Tanko,* 408 Md. 404, 418–19, 969 A.2d 1010, 1019 (2009). Instead, he appears to challenge the sufficiency of the evidence offered against him. In our view, it is of no consequence that the Petition failed to allege that Respondent's conduct wasted judicial resources. There were sufficient facts presented for the hearing judge to conclude that Respondent's behavior wasted judicial resources. Judge Thompson concluded, as a matter of law, that Respondent's conduct was inexcusable, wasted judicial resources and was prejudicial to the administration of justice. In view of the specific allegations in the

Petition and the abundance of evidence before the hearing court, we find no merit to Respondent's first exception.

■ Next, Respondent excepts on the ground that the evidence was not clear and convincing that he heard and could appreciate the direction and comment of Judge Ambrose. Respondent does not fare any better on the merits of this exception than on the merits of his first exception. The hearing judge found that when Respondent left the courtroom he was engaged in dialogue with Judge Ambrose. As he was leaving the courtroom, the judge instructed him to remain because the case was not concluded. The instructions to remain in the courtroom were given to Respondent when he was approximately a distance of 40 feet from Judge Ambrose. Judge Thompson listened to the taped recording of the proceedings that took place in Judge Ambrose's courtroom. He concluded that Judge Ambrose's statements to Respondent and his client "c[ould] be clearly heard." This fact was confirmed by the Prosecutor who testified that Judge Ambrose spoke loudly at the time she instructed Respondent that "he was not excused and that Paz–Rubio was directed to remain and the case was not concluded."

Respondent presents no factual or legal basis for us to disturb the factual findings or legal conclusions of the hearing judge. *AGC v. Tanko,* 408 Md. at 418–19, 969 A.2d at 1019 (noting that the hearing judge is in the best position to resolve questions of credibility of witnesses); *AGC v. Dunietz,* 368 Md. 419, 427–28, 795 A.2d 706, 711 (2002) (noting that a hearing judge's findings of fact are prima facie correct and will not be disturbed unless clearly erroneous). He points to no specific place in the record to support the conclusion that he did not hear or appreciate Judge Ambrose's directions. Nothing in Judge Ambrose's directions to him on May 15, 2008 or her testimony at Respondent's disciplinary hearing supports the conclusion that Respondent did not hear or appreciate Judge Ambrose's directions to Respondent and his client on May 15. Accordingly, we overrule Respondent's second exception.

■ As to Respondent's third exception, he contends that the record does not support Judge Thompson's conclusion that Paz–Rubio suffered any anxiety as a result of Respondent's conduct. Respondent maintains that at no time was his client deprived of competent and effective representation, "even for an instant."

Judge Thompson's conclusion that Paz–Rubio suffered anxiety is a reasonable inference from the circumstances that occurred on May 15, 2008. Also, the hearing judge's conclusion that Respondent failed to act in his client's best interest is firmly supported by clear and convincing evidence on the record. Judge Thompson stated:

> The departure of Respondent from the courtroom also constituted a breach of ethical responsibility to Respondent's client. One can only imagine the anxiety, uncertainty, and bewilderment of Paz–Rubio when his attorney walked out on the very authority that was to decide this important issue to the defendant. Even though the Respondent offered to provide legal services to deal with the consequences of his behavior, or to obtain another attorney at no further expense to his client, Respondent subordinated his responsibility to his client to his own desire to 'make a statement' by leaving the courtroom and advancing Respondent's agenda of showing Judge Ambrose that he was correct about the entry of a stet disposition. By doing so, Respondent misapprehended his role in the courtroom. Respondent wanted to validate the State's right to place the case on the stet docket without the Court's approval. Asserting a right for the 'benefit' of the State is not defense counsel's obligation or duty. Rather, Respondent should have been doing what was possible and ethical to obtain the best result for his client.

According to Respondent's deposition testimony, he intended to "vindicate" and to "validate" the State's right to stet a case without the trial court's approval. The record of the proceedings before Judge Ambrose reveals that Respondent left the courtroom before the case was over and left his client seated in the courtroom. Respondent rejects the conclusion

that he abandoned his client. Yet, he offers no credible response to Bar Counsel's observation that, "Respondent had no way of knowing before he left the courtroom that a recess would be called or that his client would have an opportunity to speak with him prior to the resumption of the hearing." Thus, we overrule Respondent's third exception.

■ Respondent's next exception is that Judge Thompson erred because he minimized the significance of the collateral consequences to Paz–Rubio in not obtaining a stet and also erred in restricting Respondent's examination of Judge Ambrose and Assistant State's Attorney Craven. Respondent maintains that Judge Thompson further erred by discrediting the newspaper articles that Respondent offered into evidence. According to Respondent, his client faced the risk of detention and deportation if he were to be convicted of driving without a license and, in Respondent's words, "the collateral consequences were disproportionate to the traffic offense itself."

During the hearing, Judge Thompson commented that Respondent's "concerns about the [collateral consequences] were hyperbole." Respondent takes issue with this comment. In addition, Respondent contends that the judge gave little or no weight to the number of deportation detainers placed on criminal defendants in Frederick County, that "the Sheriff of [Frederick County] has deported people," and that the "Sheriff has implemented an aggressive deportation policy."

Respondent's arguments are not persuasive. There is no requirement that the hearing judge adopt Respondent's theory of the case. The judge is at liberty to pick and choose what evidence to believe and what evidence to disbelieve, as well as what weight to give (or not) to any piece of evidence. If evidence is not relevant or competent, the evidence is not admissible. The deportation policies of the Sheriff of Frederick County are not relevant to this case. The primary issue in this case is Respondent's conduct in open court on May 15. Respondent's reasons for pursuing that course of action before Judge Ambrose, even if noble, did not and could not have justified the mis-guided and ill-founded methods he chose to

disrupt or terminate the traffic case pending before Judge Ambrose. Therefore, the exception is overruled.

■ As to Respondent's fifth exception, he maintains that Judge Thompson erred by ignoring Respondent's intention to obtain a stet for his client, and that there was established authority to support Respondent's view that his client was entitled to a stet disposition without prior court approval. Again, Respondent's view of the matter is short sighted.

We pointed out in *Usiak v. State*, 413 Md. at 388, n. 5, 993 A.2d at 41, n. 5 that Respondent's interpretation of Maryland Rule 4–248, that the court has no authority or discretion other than to grant the State's motion to stet, is plainly wrong. Even if Respondent's interpretation of the Rule were correct and existing case law supported his position, the conduct that he displayed before Judge Ambrose was not justified and clearly violated MRPC 8.4(d). Accordingly, the exception is overruled.

■ Finally, Respondent excepts to the hearing judge's failure to allow Respondent to introduce into evidence a transcript to show Judge Ambrose's resentment toward Respondent and Judge Ambrose's disregard for his client's right to effective representation. Respondent maintains that the hearing judge's ruling in that regard severely restricted Respondent's right to cross-examine Judge Ambrose.

Again, Respondent loses sight of the issues in this case. When we consider Respondent's conversations with the Prosecutor and his announced plan to walk out on the judge if she did not grant the stet, Respondent's conduct and motivation, rather than the motivation or animosity that the trial judge held toward Respondent, is relevant. For whatever it is worth, Judge Thompson commented in his written findings under the category entitled, "Mitigation," that the history between Judge Ambrose and Respondent played a role in this incident, but should not have. Judge Thompson concluded, however, that "Respondent appears to have wanted to prevail over Judge Ambrose personally." Moreover, the transcript that Respondent offered into evidence involved an unrelated

case and had no bearing on Respondent's conduct or motivation for his courtroom behavior in this case. Judge Thompson did not err in refusing to admit irrelevant evidence or limit Respondent's cross-examination of Judge Ambrose to matters that were relevant. We overrule Respondent's sixth exception, as well as his supplement to the exceptions, which was no more than a restatement of the exceptions filed in this case.

### Sanction

 The purpose of attorney disciplinary proceedings is to protect the public and not to punish the erring attorney. *AGC v. Mahone*, 398 Md. 257, 268, 920 A.2d 458, 464–65 (2007); *AGC v. Kinnane*, 390 Md. at 339, 888 A.2d at 1187. In *Mahone*, we pointed out that:

> [W]e protect the public through sanctions against offending attorneys in two ways: through deterrence of the type of conduct which will not be tolerated, and by removing those unfit to continue in the practice of law from the rolls of those authorized to practice in this State. The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed. The appropriate severity of the sanction depends upon the facts and circumstances of the case, taking account of any particular aggravating or mitigating factors.

*Mahone*, 398 Md. at 268–69, 920 A.2d at 465(Quoting *AGC v. Lee*, 393 Md. 546, 563, 903 A.2d 895, 905–906 (2005)).

As to mitigation, we have said:

> The mitigating factors listed in the ABA Standards include: absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation;

imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

*Mahone,* 398 Md. at 269, 920 A.2d at 465 (quoting *AGC v. Lee,* 393 Md. at 564, 903 A.2d at 906).

The hearing judge in the present case determined that Respondent's conduct in relation to his representation of Paz-Rubio on May 15, 2008 was prejudicial to the administration of justice and in violation of MRPC 8.4(d). We agree with that legal conclusion.

In *Mahone,* we held that a reprimand was the appropriate sanction for an attorney who violated MRPC 8.4(d) by disrupting the trial court proceedings on one occasion and walking out of the courtroom while the judge was rendering his oral opinion from the bench on another occasion. *Mahone,* 398 Md. at 269, 920 A.2d at 465. In *AGC v. Alison,* 317 Md. 523, 565 A.2d 660 (1989), this Court imposed a 90-day suspension for a violation of MRPC 8.4(d) when an attorney verbally abused court clerks, used offensive and vulgar language in court, resisted a court-ordered search, harassed his estranged wife, filed spite charges against his estranged wife for forgery, and made expletive references to police officers. The common thread running through *Mahone* and *Alison* was that the attorneys' disruptive and discourteous behavior, in court, involving court personnel and the judicial process, during the representation of a client, was prejudicial to the administration of justice and in violation of MRPC 8.4(d). The respective attorney's disrespect for the judicial process was evident in both cases. The sanction imposed for the respective attorney's misconduct, however, was different because there were more aggravating factors present in *Alison* than in *Mahone.*

■ In the present case, Bar Counsel recommends that we impose "a sanction more serious than the reprimand in *Mahone,* and less serious than the [90–] day suspension in *Alison.*" Bar Counsel points out that there are aggravating factors present, here, that were not present in *Mahone* and that Respondent's conduct, here, was not as egregious as the attorney's conduct in *Alison* because Respondent "did not

engage in a lengthy pattern of misconduct." Although we adopt, with some reluctance, Bar Counsel's recommendation for a sanction of a 60–day suspension, the Bar is advised henceforth that we do not suggest that the Court lacks the authority or the will to disbar an attorney for similar conduct as displayed by Respondent in this case, despite a recommendation for a lesser sanction than the Court may deem appropriate. *See AGC v. Duvall*, 373 Md. 482, 494, 819 A.2d 343, 350 (2003) (Announcing that in future cases a failure to respond to Bar Counsel's recommended disposition and/or to appear at oral argument will not be considered as any level of mitigation in the sound exercise of our discretion as to what sanction is appropriate). Here Respondent's misconduct was particularly egregious, and disbarment may well have been the more appropriate sanction.

At oral argument, in response to the Court's questioning, Respondent showed no remorse and was adamant that if presented with the same situation again, his actions would be the same. That response is troubling where Respondent was on notice that his decision to walk out on the court proceedings to make a point is not acceptable behavior; nonetheless, he would repeat the conduct, apparently because he believes such behavior constitutes zealous advocacy, toward the goal of protecting his client. It is the failure to distinguish between zealous advocacy that is appropriate and professional misconduct that gives the Court pause. In the present case, Respondent reacted inappropriately when the trial judge refused to grant the State's request to stet the case. His conduct was both disruptive and discourteous to the court. His decision to disrupt the legal proceedings and to disrespect the trial judge in the manner in which he did was a calculated response to the judge's anticipated ruling. In Respondent's zeal to manipulate the outcome of the court proceedings, Respondent, as the hearing court found, subordinated his responsibility to his client to his own desire to advance his own agenda. As a result of Respondent's conduct, his client was prejudiced and subjected to two bench warrants, and Respondent advised his client not to return to the courtroom for further proceedings

even though Respondent believed that the case could be easily resolved. Finally, Respondent knew that his contemptuous conduct was prejudicial to the administration of justice because of his involvement as defense counsel in *Mahone*.

Clearly, Respondent's misconduct in this case does not warrant the same disposition as that imposed in *Mahone*. Respondent's courtroom behavior, moreover, could have warranted a more severe disposition than that imposed in *Alison*. Only because this is Respondent's first disciplinary matter, where he has been the subject of disciplinary charges, do we adopt Bar Counsel's recommendation for a 60–day suspension, rather than impose a more severe sanction. Accordingly, the suspension of 60 days shall begin 30 days from the filing of this opinion.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST NORMAN CHRISTOPHER USIAK; SUSPENSION SHALL COMMENCE 30 DAYS FROM THE FILING OF THIS OPINION.**

