*Attorney Grievance Commission of Maryland v. Jonathan David Robbins*, Miscellaneous Docket AG No. 12, September Term, 2017

**ATTORNEY DISCIPLINE – SANCTIONS – DISBARMENT**: Respondent Jonathan David Robbins violated the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") and the Maryland Attorneys' Rules of Professional Conduct ("MARPC") in his capacity as attorney for Shelba Bossom, Annette Torchinsky, and Helen Nutt. Robbins made misleading representations to clients that he had performed work that he, in fact, had not performed; failed to take action to advance client matters despite requests to do so; failed to timely file a Petition to Caveat; failed to provide clients with timely invoices for work he performed for several years of representation; executed a new retainer agreement without client's authorization; and used a recently obtained Power of Attorney to retroactively increase his hourly rate from $350 per hour to $500 per hour.

Respondent violated (1) MLRPC 1.1 (Competence); (2) MLRPC 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer); (3) MLRPC 1.3 (Diligence); (4) MLRPC 1.4 (Communication); (5) MLRPC 1.5 (Fees); (6) MLRPC 1.7 (Conflict of Interest: General Rule); (7) MLRPC 8.1 (Bar Admission and Disciplinary Matters); and (8) MLRPC 8.4 (Misconduct). Taken together, Robbins' violations warrant disbarment.

IN THE COURT OF APPEALS

OF MARYLAND

---

Misc. Docket AG No. 12

September Term, 2017

---

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

JONATHAN DAVID ROBBINS

---

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty,
Adkins, Sally D.,
    (Senior Judge, Specially Assigned)

    JJ.

---

Opinion by Adkins, J.

---

Filed:   April 3, 2019

The Attorney Grievance Commission of Maryland ("AGC"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action ("Petition") against Respondent Jonathan David Robbins. Bar Counsel charged Robbins with violating the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") in his capacity as attorney for Shelba Bossom, Annette Torchinsky, and Helen Nutt.[1] Specifically, Bar Counsel alleged that Robbins violated the following rules: (1) MLRPC 1.1 (Competence); (2) MLRPC 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer); (3) MLRPC 1.3 (Diligence); (4) MLRPC 1.4 (Communication); (5) MLRPC 1.5 (Fees); (6) MLRPC 1.6 (Confidentiality of Information); (7) MLRPC 1.7 (Conflict of Interest – General Rule); (8) MLRPC 1.8 (Conflict of Interest: Current Clients: Specific Rules); (9) MLRPC 1.15 (Safekeeping Property); (10) MLRPC 1.16 (Declining or Terminating Representation); (11) MLRPC 8.1 (Bar Admission and Disciplinary Matters); and (12) MLRPC 8.4 (Misconduct). Pursuant to Maryland Rules 19-722 and 19-727, this Court designated the Honorable Harry C. Storm of the Circuit Court for Montgomery County ("hearing judge") to conduct an evidentiary hearing and make findings of fact and recommend conclusions of law. The hearing was held over five days in March and May of 2018.

Following the hearing, the hearing judge issued Findings of Fact and Conclusions of Law, in which he found by clear and convincing evidence that Robbins violated

---

[1] Effective July 1, 2016, the Maryland Lawyers' Rule of Professional Conduct ("MLRPC") were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and renumbered. Rules Order (June 6, 2016). The revised rules are listed in the Conclusions of Law section in parentheses next to the appropriate MLRPC rule.

MLRPC 1.1, 1.2, 1.3, 1.4, 1.5, 1.7, 8.1(a), 8.4(a), 8.4(c), and 8.4(d). The hearing judge found that Robbins did not violate MLRPC 1.6(a), 1.8, 1.16, or 8.4(b).

## THE HEARING JUDGE'S FINDINGS OF FACT

Robbins was admitted to the Maryland Bar in 1988. Upon admission, he began work with Ernst & Whinney[2] and practiced law part-time. He is also licensed as a Certified Public Accountant and a Certified Financial Planner, holding professional financial specialist and global management accountant designations from the Association of International Certified Public Accountants. Robbins is a solo practitioner. He operates the Law & Accounting Offices of Jonathan D. Robbins, Chartered, a law/accounting/estate and financial planning business. Approximately 50% of his time is spent preparing income tax returns and providing representation to clients with matters brought by tax agencies. The remaining half of his time is focused on legal work involving trusts and estates, formation of business entities, and litigation over trusts and estates. At all times relevant to the matters before us, Robbins handled all secretarial, administrative, paralegal, and IT support functions himself. Robbins logged incoming and outgoing phone calls and all time billed for calls and other work was entered into the Timeslips computer program when the work was performed. By Robbins' own testimony, it is his practice to only send client invoices "when jobs are completed." He also performs discrete tasks for flat fees "whenever possible."

---

[2] Later Ernst & Young LLP, now doing business as EY.

The AGC's investigation of Robbins was set in motion by the complaints of Shelba Bossom, Annette Torchinsky, and Helen Nutt. As to each complaint, Judge Storm made the following findings of fact by clear and convincing evidence:

## Complaint of Shelba Bossom

In 1992, Robbins prepared estate planning documents for Shelba Bossom's mother, Louise Sutherland, which named Bossom as successor trustee and sole beneficiary of Sutherland's estate. Soon after Sutherland's death in May 2012, it came to light that in July of 2007, Sutherland executed revised estate planning documents, which named Bossom's daughter, DeLee Yaukey, and son-in-law, Kirk Yaukey, as successor trustees and personal representatives. The new documents set forth that Sutherland's estate was to be equally divided between Bossom and her daughter.

Bossom executed two retainer agreements with Robbins on May 22, 2012. The first was for Bossom as personal representative of her mother's estate and the second as trustee of her mother's trust ("2012 Bossom Retainer Agreements").[3] Given the amendments that Sutherland made in 2007 to her estate planning documents, Bossom was no longer named personal representative or trustee. Robbins stated that he was hired "to find out what was happening in terms of the financial situation that Louise Sutherland left once she died."[4]

---

[3] Shelba Bossom provided Jonathan David Robbins, Esq. with an initial retainer in the amount of $1,500.

[4] Louise Southerland's 2007 Will was filed for probate on June 12, 2012. DeLee Yaukey was appointed as the personal representative of the Southerland estate.

The 2012 Bossom Retainer Agreements include the following provisions:

° The hourly rates of the attorneys, paralegals and administrative personnel who will work on these matters will range from $50.00 - $75.00 per hour for administrative personnel, $75.00 - $100.00 per hour for paralegals and legal assistants and $350.00 per hour for attorneys.

° The Firm will send you a monthly (or less frequent) statement for services rendered and costs incurred.

The Retainer Agreements also included provisions giving Robbins "the right to request replenishment of the retainer 'so that representation may continue'" and the "unilateral right to withdraw from further representation" if invoices or statements were not paid within 30 days.

On June 26, 2012, Robbins informed Bossom that he had "hired Eugene Kane, Jr., Esq. to assist with the imminent litigation." Robbins represented that he was drafting documents to be filed with the court, affidavits, and a letter to DeLee. He also requested that Bossom replenish her retainer with $5,000. The hearing judge found that there was "no credible evidence showing that at the time of this communication Mr. Robbins was in fact drafting any court documents."

On July 10, 2012, Robbins communicated to Bossom that "the situation is urgent at this time" and "we must and will file the necessary challenges [to the 2007 Will] as soon as possible." Yet, another three months passed before Robbins told Bossom that his part of the Caveat document was complete and that he had "almost finished with the Complaint document." Finally, on December 15, 2012 Robbins again indicated that he "expect[ed] to be able to file the lawsuit against [Mr. Yaukey] very shortly." The hearing judge found

4

"no credible evidence, either from [Robbins'] time and billing entries or otherwise, to support" this representation by Robbins.

On December 15, 2012, Robbins advised Bossom that "the Petition to Caveat would be filed 'on Monday' and that he had waited 'until this point' to file the Petition 'to give [the Yaukeys] the maximum amount of time to respond to our original letter to disclose information and provide requested documents.'" Robbins also represented that he had not received a response from the Yaukeys to his July 13 request for information and documents related to Sutherland's estate when, in fact, in late July, their attorney, Scott A. Morrison, had declined to provide any documents.[5] This notification occurred three days after the statutory deadline had passed mandating that a Petition for Caveat be filed "prior to the expiration of six months following the appointment of a personal representative," Maryland Code (1974, 2011 Repl. Vol.), § 5-207(a) of the Estates and Trust Article ("ET"). Consequently, the hearing judge found this statement to be misleading.

Robbins ultimately filed the Petition to Caveat on December 19, 2012—seven days late. An order was issued on December 20, 2012 dismissing the Petition as untimely pursuant to ET § 5-207(a). Bossom received notice of the dismissal on December 22, 2012 and emailed Robbins.[6] The hearing judge found that "no material work appears to have been performed in furtherance of Shelba Bossom's case between July [24,] 2012 when Mr.

---

[5] There is no evidence that Robbins followed up. According to Robbins' timekeeping and billing records, he received documents from Scott A. Morrison on October 27 and November 5.

[6] Robbins' billing entries indicated he spoke with Bossom by phone that day.

Morrison responded to [Robbins'] letter and December [19,] 2012, when Mr. Robbins filed the untimely Petition to Caveat the 2007 Will . . . ."

From June 2012 through September 2013, Robbins made a number of misleading statements to Bossom wherein he represented that he was working on the Complaint. On January 22, 2013, he emailed Bossom and indicated that "I am hopeful that I can complete the complaint against [the Yaukeys] this week and have it sent to Eugene Kane for his review over the weekend. This is an extensive complaint and am looking forward to it being filed very shortly." The judge found this to be misleading, as there was "no credible evidence, either from [Robbins'] time and billing entries or otherwise that as of January 2013, [Robbins] had drafted a complaint." The hearing judge also found that there were no billing entries from January 22, 2013 through April 13, 2013.

On April 13, 2013, Bossom emailed Robbins requesting another update. Robbins responded on April 19 stating:

> I had to get through tax season and I have gotten rid of the lawyer that I hired to assist in the litigation. I am interviewing several others and I like one better than the rest. I am preparing to file suit and will be in touch with you next week to discuss the relevant issues.

The hearing judge found "no credible evidence showing that on April 19, 2013, [Robbins] was 'preparing to file suit.'" Nor is there evidence in Robbins' "time and billing entries or otherwise, showing that as of April 19th he had interviewed any other attorney to assist with the litigation." Thus, these statements were also misleading.

On May 1, 2013, Bossom and Robbins received the First and Final Account of the Sutherland Trust. On May 16, 2013, Robbins again assured Bossom that he "expected to

6

provide her with a draft complaint for review and comment within the next week and stated, 'I want to file suit against [the Yaukeys] by the end of next week in the Montgomery County Circuit Court.'" The hearing judge found that there was "no credible evidence, either from [Robbins'] time and billing entries or otherwise, to suggest [Robbins] had either begun the draft of a complaint, or that he would otherwise be prepared to file suit within the next week."

Between early July and September of 2013, Bossom tried on numerous occasions to get updates from Robbins. His responses to the various requests included that: he was "in the middle of a deadline" and would try to call to "discuss the case"[7]; he had been in a "very bad accident several weeks ago, surgery" but he was "ready to sue"[8]; and he had been "extremely busy."

Morrison wrote Robbins on September 6, 2013 to advise that the Yaukeys would be moving forward with the distribution of the trust assets as set forth in the First and Final Account dated May 1, 2013.[9] Robbins responded indicating that Bossom "continued to assert that the July 2007 Will and trust amendment were invalid and that no distributions should be made."

---

[7] There was no evidence that Robbins followed-up with a call.

[8] Robbins misled Bossom when he indicated he was "ready to sue" as the hearing judge found that there was no credible evidence, in Robbins' time and billing entries or otherwise, that on July 29 he had drafted a complaint or that one was ready to be filed.

[9] In mid-July, Morrison wrote Robbins to inquire whether he was still representing Bossom.

In September 2013, Robbins met with Robert Scanlon and retained Scanlon's services as litigation counsel for Bossom against the Yaukeys. The court found that this was the first "meaningful action" Robbins took in 14 months.

Scanlon drafted a complaint within weeks of being retained and sent it to Robbins for review. He also advised Robbins on September 19 that he had spoken with the Bossoms and they were ready to proceed. On September 28, Robbins provided a copy of the Complaint to Bossom and requested that she send $5,000 "to cover fees and expenses" as well as Scanlon's fees. Suit was filed on October 7, 2013 in Montgomery County Circuit Court and identified both Robbins and Scanlon as counsel. The Complaint alleged, *inter alia*, that the 2007 trust agreement was procured by undue influence. The hearing judge found that there was "no credible and reasonable explanation offered by [Robbins] for the delay in preparing and filing suit against the Yaukeys." Even after Scanlon was retained to assist with the litigation, Robbins remained the primary point of contact for Bossom, despite having knowledge that he would be a witness in the litigation.[10]

In May 2014, Robbins told Bossom that, "[A]ll aspects of your litigation are proceeding well and in your favor. I am very happy with the way things are moving." Then on June 24, Scanlon received an offer from the Yaukeys' attorney to settle the litigation, which "made clear that the Yaukeys viewed the litigation as having triggered a 'no contest' clause of the trust, thereby revoking any interest Shelba Bossom had therein (meaning that if the no contest clause was upheld, Shelba Bossom would receive nothing)."

---

[10] Robbins was even present during Bossom's deposition preparation, although he did not participate.

8

Later that year, Robbins and Scanlon began to disagree on strategy. Robbins communicated to Bossom that he suspected "Scanlon might be conspiring with the Yaukeys or their counsel, perhaps having a side agreement whereby, if the case settled, Mr. Scanlon would receive a secret kickback." This put a strain on Scanlon's ability to communicate effectively with Bossom and planted seeds of doubt in her mind about his integrity. Eventually, Bossom told Scanlon that "communications should go through Mr. Robbins," but Scanlon admittedly was able to speak with Bossom when necessary.

By the end of November 2014, Robbins had begun to try to retain additional counsel. In December, Robbins brought in James E. Edwards, an attorney with whom he had shared his theory regarding Scanlon having a deal to receive a kickback when the case settled. Edwards agreed to investigate the case and sent a retainer agreement to Bossom. Edwards met with Scanlon and determined that Scanlon "appeared competent and prepared to handle the case[.]" Edwards agreed to take a limited role in the Bossom matter and help manage the relationship between Robbins and Scanlon.

Despite having retained Scanlon and Edwards in the Bossom matter for their litigation prowess and knowing that he would be called as a witness, Robbins was determined to "remain in control of the client, and as the lead conductor on the direction of the case and any settlement strategy" and filed a "Line" in January 2015 to document that Bossom was being represented by him and the Law & Accounting Offices of Jonathan D. Robbins, Chartered. Many of Robbins' actions were erratic and conflicted with trial counsel's advice, including failing to withdraw his appearance until April 22, 2015—the

day before the trial.[11]  Robbins also withdrew a settlement offer made to the Yaukeys without consulting Scanlon or Edwards.

Robbins drafted a term sheet for the March 16, 2015 mediation estimating damages at approximately $2.8 million.[12]  Scanlon and Edwards had reservations about components of the term sheet.  Scanlon testified that, at the mediation, Robbins told Bossom "that the case was as close to a 'slam dunk' as he had ever seen, and that he wanted $2.4 million."  Bossom, following Robbins' advice, wanted to proceed to trial.  In Scanlon's estimation, if Bossom won, the "best case" would have been that she received $1.2 to $1.3 million.

The trial started on April 23, 2015.  On the fourth day of trial, the Yaukeys "made a 'substantial settlement offer.'"  Scanlon discussed this with the Bossoms and Edwards.  While Scanlon and Edwards agreed to reduce their fees to "make the numbers work," they needed to speak with Robbins about his fees because he had never sent Bossom a billing invoice, and the only amount they had for reference was that which Robbins included on the term sheet he had prepared.  Edwards testified, and Scanlon corroborated, that when Robbins was informed of the settlement offer, he "became very agitated," was verbally abusive to Edwards, and Robbins' response upset the Bossoms.  A confidential settlement was eventually reached.

---

[11] Litigation counsel also believed that Robbins had not sufficiently relayed the litigation risks to Bossom and that he had overestimated the value of the case.

[12] Included in the damages calculations were "attorneys' fees already paid to Mr. Robbins in the amount of $37,732.87, and an estimate of outstanding legal fees owed to [Robbins] of $150,000.00."

Between November 11, 2013 and May 22, 2014, although Robbins had still never provided Bossom with an invoice or billing statement, he requested that she provide additional funds to replenish her retainer. In November 2013, Robbins told Bossom that he would provide her with a copy of Scanlon's invoice, but Robbins was not able to send his invoice because he was "slowly preparing" them. In January of 2014, Robbins still had not sent Bossom a copy of his or Scanlon's invoice. He used the excuse that his scanner was not working and said he would email Scanlon's invoices once it was functioning. Robbins further told Bossom that his "invoices will be sent out in about two to three weeks." At the end of February, Robbins requested payment and indicated that it "should cover both January and February legal fees and expenses." At this point, he still had not provided Bossom with a copy of the invoice, so she responded by asking him to "send her an accounting of [her] expenses to this date." Robbins replied, stating in part:

> I received your e-mail message and I will forward Robert's invoices as soon as I receive his latest one. My invoices are a bit more complicated and will take a little more time to forward to you. The complication is a result of my giving you sizable "courtesy discounts" over time. I have a higher billable rate than does Robert and I want to keep my portion of the bills at a reasonable amount for you.

Again, in late May 2014, Robbins told Bossom that he had "reviewed Robert Scanlon's billing statements and I will be writing down my statements to you. However, you are in the most expensive part of the lawsuit."[13] The hearing judge found that there was "no

---

[13] Robbins requested $5,000 on November 11, 2013; $11,000 on January 16, 2014 ($6,800 for Robert Scanlon's invoice and $4,200 for his charges); $11,000 on February 27, 2014; and $16,000 on May 22, 2014. Bossom paid Robbins an additional $13,000 in September 2014.

credible evidence" to show: that "sizeable courtesy discounts were ever given," that Robbins wrote down his statements to Bossom, or that he had been preparing his statement.

On June 8, 2014, Robbins sent Bossom a Durable Power of Attorney for the Property of Shelba Ann Sutherland Bossom, which granted Robbins "broad power to act on Bossom's behalf." Bossom executed it and returned it to Robbins. Three weeks later, Robbins used the Power of Attorney to execute a new engagement agreement between Bossom, in her individual capacity, and Robbins' firm. This retainer agreement increased Robbins' hourly rate to $500 per hour from $350 per hour, and made the new hourly rate "retroactive to May 22, 2012." Robbins testified that that he had signed the July 1, 2014 Retainer Agreement for "administrative purposes" and that he had discussed it with Bossom, she had agreed to it, and he had mailed a copy of the Retainer Agreement to her. There was no documentation of any of this in his time and billing entries. The hearing judge found that:

> [T]here was no credible reason advanced by [Robbins] for why he used his authority under the recently granted Power of Attorney to execute the July 1, 2014 Bossom Retainer Agreement, rather than have Ms. Bossom execute it herself. After all, just three weeks earlier, he provided the Power of Attorney to Shelba Bossom for personal signature.
>
> Simply put, there is no credible evidence that Ms. Bossom authorized [Robbins] to use the Power of Attorney to execute the July 1, 2014 Bossom Retainer Agreement, that [Robbins] told her he used the Power of Attorney for that purpose, or that Ms. Bossom was even aware of the existence of that document until after the representation ended in April 2015.
>
> The court rejects [Robbins'] claim that Shelba Bossom agreed to his nearly forty-three (43%) increased rate change in their December 22, 2012 telephone call [as asserted by Robbins]. It

12

strains credibility to believe that Ms. Bossom willingly agreed to a $150 per hour increase on the same day that [Robbins] would have discussed with her the fact that the Caveat proceeding had been dismissed because he filed it too late. Respondent's version is simply not credible.

In early May of 2015, Bossom received a 56-page billing invoice from Robbins, which spanned May 21, 2012 to April 30, 2015—nearly three years—the entirety of his representation of Bossom. The hearing judge wrote that:

> The Court does not find credible and rejects Respondent's testimony to Bar Counsel that he provided Ms. Bossom with information about his billing statements "every single time [she] asked for retainer replenishment and then thereafter on several occasions." Moreover, despite statements that he intended to provide a statement "shortly" or "Within a few weeks," that never occurred. There is likewise no evidence that Mr. Robbins provided the "sizeable courtesy" adjustment that he indicated would be forthcoming.

From May 2012 to May 2015, the attorneys' fees and costs that Robbins charged Bossom were $219,330. During the course of his representation, Bossom paid Robbins $31,992.96. From April 22, 2015 to April 31, 2015—after Robbins had withdrawn his representation— he included further charges in a second invoice to Bossom totaling $21,200.

Bossom filed a complaint against Robbins with Bar Counsel in August 2015. Bar Counsel also obtained information from Scanlon and Edwards regarding "observations and concerns" they had about Robbins. A copy of the complaint was sent to Robbins on September 10, 2015 with a request that he provide a written response.

In his response to Bar Counsel dated October 7, 2015, Robbins stated that "Bossom (i) never requested a billing invoice during the pendency of the representation; (ii) that she had agreed verbally to an increase in his hourly rate[;] and (iii) that she authorized him to

13

execute the July 2014 Agreement using the Power of Attorney." The hearing judge found that Robbins' first statement was "misleading" and his "second statements were knowingly false and misleading."

Bar Counsel took Robbins' statement under oath in July 2016 in which he testified that Bossom "did not want to see Mr. Scanlon's bills, and that she authorized [Robbins] to sign the July 2014 Bossom Retainer Agreement." The hearing judge found that these statements were "knowingly false and misleading."

**Complaint of Annette Torchinsky**

In late November 2012, Annette Torchinsky contacted Robbins regarding representation on estate planning and tax matters. Torchinsky signed a retainer agreement[14] (the "First Torchinsky Retainer Agreement") on December 28, 2012 and gave Robbins an initial retainer of $3,500. The representation was "in connection with her estate planning, Income Tax Return preparation and other matters as [she] may refer to [Robbins] from time to time." The First Torchinsky Retainer Agreement provided the following:

> The hourly rates of the attorneys, paralegals and administrative personnel who will work on these matters will range from $50.00–$75.00 per hour for administrative personnel, $75.00–$100.00 per hour for paralegals and legal assistants and $350.00 per hour for attorneys.
>
> * * *
>
> Client acknowledges that, if Client has received an estimate of the fees and costs that may be incurred in connection with the legal and accounting services that we will provide, that estimate is not a fixed fee and does not constitute a

---

[14] This was the standard retainer agreement that Robbins used with all clients, regardless of whether the matter was to be billed at an hourly rate or a flat fee.

14

commitment by the Firm to perform the described services for that amount or an obligation by you to pay that amount.

* * *

The Firm will send you a monthly (or less frequent) statement for services rendered and costs incurred.

* * *

It is the Firm's practice to obtain a retainer before we commence work for new clients. This retainer is used to pay the Firm for services rendered and costs incurred on your behalf in accordance with this Engagement Letter. From time to time, the Firm may ask you to replenish all, a part of, or more than your retainer so that representation may continue. Upon completion of all work to be performed by the Firm for you, we will return to you any unused portion of your retainer which may exist. We believe that a retainer of $3,500.00 is appropriate under your circumstances.

Robbins testified that, from the beginning of his representation, Torchinsky was insistent that she did not want to see any invoices. Robbins presented no evidence to support this assertion. While conceding that she had not asked Robbins to provide an invoice, Torchinsky denied having told Robbins that she did not want to see billing statements.

Torchinsky and Robbins gave conflicting testimony regarding whether some of the work performed by Robbins was to be on a flat fee basis.[15] Despite evidence that he had

---

[15] Examples of flat fee work that Robbins initially did for Torchinsky included: (i) preparation of an employment agreement between Torchinsky and her parents; (ii) revisions to Torchinsky's father's estate plan; (iii) revision and redrafting of Torchinsky's personal estate planning documents; (iv) preparation of Torchinsky's 2012 tax returns; (v) "business organization" of Torchinsky's company, Kindle Korp, LLC; and preparation of a personal property tax return for Kindle Korp.

done some flat fee work for Torchinsky, Robbins testified that he had not. Specifically, under oath, Robbins asserted that "[d]uring my entire representation of [Torchinsky], I never produced or worked on any 'flat fee' item. No 'flat fee' item ever existed during the entire time I had represented her[.]" Yet, Robbins indicated to Bar Counsel in correspondence and a sworn statement that there were 22 flat fee documents. The hearing judge noted that, "The court does not find credible [Robbins'] later attempts to pedal back from his use of the term 'flat fee' in describing some of the work performed for Ms. Torchinsky."

Robbins met Torchinsky's father, Irving Torchinsky ("Irving"), on January 9, 2013. Notwithstanding that Robbins had never met Irving prior to this date, Robbins had prepared a retainer agreement and estate planning documents and presented them to Irving for execution. The documents included a "parent and adult child conflicts waiver letter," an Employment Agreement, a Durable Power of Attorney for the Property, and a Living Will and Durable Power of Attorney for Health Care Decisions.[16] Irving signed the Employment Agreement, Power of Attorney, and Living Will, but did not sign the retainer agreement or the conflicts waiver letter. Despite Irving's failure to sign these documents, Robbins went forward with his representation of Irving. Robbins testified that he explained the potential conflict to Irving in detail, and that Irving "waived it verbally." The court found this testimony to lack credibility.

---

[16] Annette Torchinsky had asked Robbins to prepare the documents due to disagreement among her family about her parents' care.

16

By this point, Robbins and Torchinsky's relationship had become more personal than just that of attorney and client, and by June of 2014, the were involved in a sexual relationship. On May 27, 2013, Torchinsky executed a second retainer agreement for work to be done relating to Kindle Korp, LLC (the "Kindle Korp Retainer Agreement"). This retainer agreement only differed from the 2012 Torchinsky Retainer Agreement in that non-income tax matters were billed at $500 per hour and a $1,300 retainer was required. Robbins also handled a leasing matter for a rental property owned by Torchinsky. On June 8, 2013, in an email, she inquired how much this would cost and Robbins' response was, "Let me work on the amount."

In July 2013, as Torchinsky's relationship with her siblings grew more contentious, Robbins told her that litigation was probable. Robbins began to discuss Torchinsky's litigation needs with Robert Scanlon and continued to communicate with him regarding her issues. The pending litigation with Torchinsky's siblings never materialized, but Robbins continued to engage in discussions with Torchinsky's siblings and their counsel into 2014.

On alleged advice from Robbins, Torchinsky had taken out a home equity line of credit ("HELOC"). In July, he instructed her to pay him $50,000 out of her HELOC as a retainer. Torchinsky provided Robbins with two checks equaling $50,000 to replenish her retainer. Robbins used these funds to make regular payments to himself and three

payments to Scanlon's firm. The court was not persuaded by Torchinsky's testimony that Robbins had requested and maintained the $50,000 for future litigation.[17]

In October of 2013, Torchinsky executed estate planning documents that Robbins had prepared for her. Approximately five months later, Robbins, allegedly at the request of Torchinsky, again prepared and attempted to have Irving execute a new retainer agreement, conflict waiver related to a durable power of attorney, and living will/health care power of attorney. Irving did not sign them.

The hearing judge found that from July 2013 through the summer of 2014, Robbins' representation included much more than only preparing flat fee documents for Torchinsky. Torchinsky never asked Robbins for an invoice related to the disbursements from the $50,000 retainer. Robbins was able to pay himself without any accountability for two years because he failed to provide Torchinsky with billing statements. Regular invoices would have clarified what work was being performed on an hourly basis and what was being completed on a flat fee basis.

Torchinsky terminated Robbins' representation by letter dated July 7, 2015. In the letter, she itemized the work she believed to have been done on a flat fee basis. Robbins responded on July 9, 2015 acknowledging that some tasks had been done on a flat fee basis. He also advised:

> (i) That he had "constantly" advised Ms. Torchinsky of the status of her retainer balance.

---

[17] Robbins disputes Torchinsky's version of events, stating that the money was to replenish her retainer and to be made available for the litigation with her siblings.

(ii) That he had "made known" to Ms. Torchinsky that the $50,000 had been earned and removed from his trust account.

(iii) That Ms. Torchinsky "specifically directed" that Respondent was not to provide her with any billing invoices "under any circumstances."

(iv) That Ms. Torchinsky repeatedly stated that she did not want to see her invoices.

The hearing judge had "doubts" regarding statements (i) and (ii), but found statements (iii) and (iv) to "have no credibility."

The only invoices that Robbins ever sent Torchinsky were provided to her at the end of July 2015. The first was a 71-page invoice covering work performed for Torchinsky in her individual capacity between November 26, 2012 and July 7, 2015. The second was for work he did for Kindle Korp, LLC. These invoices reflected work billed on an hourly basis with attorney's fees being $149,005 and total expenses of $1,714.37.

On August 13, 2015, Torchinsky filed a complaint against Robbins with Bar Counsel. In Robbins' response, he acknowledged that several tasks were billed on a flat fee basis. He also told Bar Counsel that Torchinsky required "that she was to receive no billing statements" as a condition of Robbins' employment—a claim that Torchinsky denied had ever occurred. The court found that Robbins' statement to Bar Counsel was knowingly false and misleading. Again, on June 3, while under oath Robbins told Bar Counsel that Torchinsky was "quite clear by stating that under no circumstances was she ever to see an invoice from [him]."[18]

---

[18] A recess was taken so Robbins could review his documents and billing entries and specifically identify entries billed on a flat fee basis and those billed on an hourly basis.

Yet, when Bar Counsel's interview resumed on July 1, 2016, Robbins revised his earlier testimony stating:

> [D]uring the entire time I represented Ms. Torchinsky, all work that I ever did for her, without exception, was charged at my hourly rate of $350 in accord With the Client Engagement Agreement which she signed on December 28, 2012[. . . .]During my entire representation of her, I never produced or worked on any "flat fee" item. No "flat fee" item ever existed during the entire time I had represented her.

Again, while under oath, Robbins stated that Torchinsky expressly indicated that she never wanted to see an invoice or billing statement.

### Complaint of Helen Nutt

Helen Nutt was nearly 88-years old when she and her son, Randy Nutt, met Robbins to discuss estate planning matters.[19] At the time, Nutt's assets were valued at approximately $2 million to $2.5 million. Nutt fell in her home soon after retaining Robbins. She spent a week in Holy Cross Hospital, then was transferred to a rehabilitation facility, and finally settled in an assisted living facility.

Nutt retained Robbins to represent her "for estate planning and other matters" on October 6, 2013 ("Nutt Retainer Agreement"). The retainer agreement set Robbins' billing rate at "$350 per hour for most tax return preparation engagements and $500 per hour for all other matters." The Nutt Retainer Agreement set forth hourly billing rates ranging "from $50.00-$75.00 per hour for administrative personnel, $75.00-$100.00 per hour for

---

[19] Shortly after this meeting, Randy Nutt died leaving Helen Nutt's daughter, Nancy Nutt; Nutt's sister, Ruth Ann Taylor; and Ruth Ann Taylor's children as Nutt's only living relatives.

paralegals and legal assistants and from $350.00 to $500.00 per hour for attorneys." Nutt paid an initial retainer of $3,500. In boldface type and underlined in the Nutt Retainer Agreement it was set forth that "[w]here possible, work will be done on an [*sic*] flat fee amount basis."

The initial estate planning documents prepared for Nutt included a Durable Power of Attorney for the Property of Helen E. Nutt, a Living Will and Durable Power of Attorney for Heath Care Decisions of Helen E. Nutt, a Revocable Trust, Last Will and Testament, and amendments to the Helen Nutt Living Trust and the James Nutt Family Trust. Robbins identified himself as Helen Nutt's "attorney and personal friend" and named himself as her agent or health care surrogate. He also was named as Trustee, personal representative, and co-trustee on the respective documents.

According to the testimony that Robbins provided, Nutt suffered from several deficits including aphasia causing her speech to be impaired; mild dementia; short term memory loss; and inability to recall amounts, dates, and, eventually, to write checks. He also testified that Nutt could not remember information about her income and expenses that he verbally provided to her because of a long-term deficit. As a result, Robbins stated that he "was actively involved in the management of her legal, financial and personal affairs." He wrote checks and paid bills for Nutt, including paying himself, all the while charging her $500 per hour.

Robbins stayed in touch with Nutt's sister, Ruth Ann Taylor, regarding his representation of Nutt, but never provided an invoice or billing statement because "[t]hey weren't insistent on any invoices." On several occasions, Taylor relayed to Robbins that

21

Nutt wanted a report on her finances and Robbins' fees.[20]  Robbins avoided providing the information requested by making excuses and stating that he had "discussed [Nutt's] expenses with her every time that I visit her.  I visit her at least once every two weeks.  Helen knows what her expenses are and probably forgets the information very quickly.  She also has the same problem when I explain what her asks are."

Finally, on November 11, 2015, Robbins presented a 109-page invoice with charges totaling $322,050.00 in fees and $20,920.04 in expenses—the only invoice he had ever provided, which covered from September 10, 2013 through November 11, 2015.  The hearing judge did not find Robbins' testimony to Bar Counsel credible when he said that "he told Helen Nutt 'almost every single time he [saw] her' what his fees were, and that he provided Ruth Ann Taylor with estimates."  Moreover, the judge credited expert testimony concluding that Robbins' fees in this matter were far above average.

Robbins' representation of Nutt was to include preparation of a financial plan and also preparation of income tax returns for her and her trusts.  While Robbins told Taylor in February of 2015 that he had been working on "a detailed financial plan" for Nutt "for a number of months," when he was interviewed by Bar Counsel in July 2016, there was no such financial plan.  Robbins explained that when he made that representation to Taylor, he had begun to compile information to go into the plan.  Robbins' excuses about why he had not completed the plan were not convincing to the hearing judge.  Robbins also failed

---

[20] These communications occurred throughout the course of Robbins' representation of Nutt, specifically on May 25, 2014; June 8, 2014; July 10, 2014; October 22, 2014; January 20, 2015; and February 8, 2015.

to prepare or file income tax returns for Nutt or her trusts for 2013, 2014, or 2015. He claimed he was unable to do so because there was missing financial information and despite his "several" requests to the IRS, he had not obtained the needed information to file the tax returns. The hearing judge found these excuses to be unconvincing.

## THE HEARING JUDGE'S CONCLUSIONS OF LAW

From these facts, the hearing judge concluded that Robbins, through his representation of Bossom, Torchinsky, and Nutt, violated MLRPC 1.1, 1.2, 1.3, 1.4, 1.5, 1.7, 8.1 and 8.4.[21] The hearing judge also concluded that Robbins did not violate MLRPC 1.6, 1.8, or 1.16. We address these rulings and any pertinent exception as follows.

## DISCUSSION

### Standard of Review

"In attorney discipline proceedings, this Court has original and complete jurisdiction and conducts an independent review of the record." *Attorney Grievance Comm'n v. McClain*, 406 Md. 1, 17 (2008). Still, we accept the hearing judge's findings of fact, unless they are found clearly erroneous. *See Attorney Grievance Comm'n v. Ugwuonye*, 405 Md. 351, 368 (2008) (citation omitted). The hearing judge's findings of fact are not clearly erroneous if they are supported by "any competent material evidence," *Attorney Grievance Comm'n v. McDonald*, 437 Md. 1, 16 (2014) (citation omitted), and "we have said that the

---

[21] Jonathan David Robbins's violation of MLRPC 1.1 and 1.3 were specific to his representation of Shelba Bossom and Helen Nutt. His violation of 1.2 was specific to his handling of the Bossom matter only. The MLRPC 8.1 violation was specific to both the Bossom and Torchinsky matters. Robbins's violation of 1.4, 1.5, 1.7 and 8.4 related to all three clients, Bossom, Torchinsky, and Nutt.

hearing judge 'may pick and choose what evidence to believe,'" *Attorney Grievance Comm'n v. Woolery*, 462 Md. 209, 230 (2018) (citation omitted).  We review proposed conclusions of law *de novo*.  *Id.*

**Findings of Fact**

*Respondent's Factual Exceptions*

Both parties are permitted to file "(1) exceptions to the findings and conclusions of the hearing judge, [and] (2) recommendations concerning the appropriate disposition . . . ." Maryland Rule 19-728(b).  Robbins takes exception to many of the hearing judge's findings of fact.  There is significant overlap between Robbins' factual and legal exceptions, though most are more appropriately reviewed in the findings of fact section. Bar Counsel does not except to any findings of fact, so we only review Robbins' exceptions.[22]

*(i) Exceptions Regarding the Bossom Matter*

Robbins argues that, without hearing from Bossom or her husband, the Court rendered credibility determinations "without citation to any evidence contrary to

---

[22] Robbins also argues that Bar Counsel engaged in misconduct and that, consequently, his due process rights were irreparably harmed and the Attorney Grievance Commission's case should be dismissed or docketed anew.  Twice before the courts have rejected Robbins' arguments on these points.  First, Robbins made substantially the same argument regarding discovery before the Circuit Court for Montgomery County in a Motion to Compel Discovery and Request for Sanctions Regarding Discovery.  This motion was denied.  Again, in March 2018, Robbins filed a Motion for Sanctions and Appropriate Relief making precisely the same arguments.  The Circuit Court denied the motion, and, on March 22, 2018, this Court, too, rejected it.  Robbins presents no new information or further factual support that would require us to depart from our previous rejection.  Thus, we feel no compulsion to address these claims, again, here.

Respondent." We note that, beyond Bossom's initial complaint letter, the Bossoms did not testify in this proceeding. Yet, the hearing judge relied on various other forms of evidence, such as email communications between Robbins and Bossom, the existence and nonexistence of time log entries, and the testimony of the other attorneys involved in the case, plus the logical inferences that could be drawn from such evidence. These are all valid forms of "contrary" evidence appropriately used to render credibility determinations, which we review below.

Bar Counsel responds to this exception, and nearly all of Robbins' additional exceptions, with a similar refrain: "Respondent's factual exceptions are based on the hearing judge's failure to adopt the Respondent's versions of events." Bar Counsel also notes that Robbins takes similar exception to "incorrect or unreasonable inferences" drawn from these facts. We will consider Bar Counsel's objection throughout this section.

A party challenging a hearing judge's factual findings must demonstrate that the finding was clearly erroneous. *See Attorney Grievance Comm'n v. Post*, 379 Md. 60, 74 (2003) (citations omitted). Many of Robbins' exceptions, as Bar Counsel rightly points out, are simply based on his own competing testimony. Because we must "give due regard to the opportunity of the hearing judge to assess the credibility of the witnesses," Md. Rule 19-741(b)(2)(B), we will not disturb determinations based on a good faith credibility determination.

There is no question that the hearing judge cited considerable evidence regarding the Bossom matter. Robbins does not specify which credibility determinations he takes issue with, but we will review many such determinations below. As a global matter, if

25

"Respondent [does] not present further evidence in the record to reveal that the hearing judge's findings were clearly erroneous," we will not credit these exceptions. *Attorney Grievance Comm'n v. Thompson*, 462 Md. 112, 134 (2018).

Robbins' first, more specific exception relates to the hearing judge's findings regarding Robbins' failure to provide invoices. Specifically, he takes exception to the hearing judge's conclusion that the retainer agreement, providing that any bill must be paid within 30 days of an invoice to avoid "withdrawal from further representation" implied that invoices would be provided during the representation. Robbins claims this is "speculation" and does not rise to the clear and convincing evidence level.

We disagree, as the hearing judge had ample grounds to find that Robbins wrongfully failed to provide Bossom with invoices. First, the judge cites the many years of assurances Robbins provided to Bossom that invoices and billing statements were forthcoming. He also points to Bossom's specific request that Robbins produce an "accounting of [her] expenses to date." Robbins repeatedly stated that he was in the process of creating such an invoice but failed to do so within a reasonable time. In January 2014, Robbins stated that his invoices would be sent out in "two to three weeks," but they were not sent until well more than a year after that.

Additionally, the hearing judge relied on the statement in the retainer providing that representation would be "discontinued" on nonpayment of an invoice. From this statement, he inferred that the representation agreement anticipated that invoices would be provided during the course of representation. This inference—alone a weak reed—lends support to the hearing judge's overall conclusion that Robbins unreasonably failed to provide Bossom

with invoices. The above facts, in total, provide clear and convincing evidence to support the hearing judge's factual conclusion. Consequently, we overrule this exception.

Robbins further objects that the hearing judge "failed to acknowledge" that he had testified to drafting the Petition to Caveat, but that he made a "mistake in the filing" of the document. Robbins makes substantially the same objection to the judge's conclusion that "no credible evidence" existed, as of Robbins' October 8, 2012 email, that he had completed any portion of either the caveat or complaint, as he claimed. Again, Robbins claims that he was drafting both documents and that no contrary evidence was admitted.

The hearing judge is the arbiter of credibility, and he did not find Robbins' testimony credible. The hearing judge relies on evidence demonstrating that the Petition to Caveat was filed a week late and that no work was entered into Robbins' time log as proof that none of these tasks occurred as stated, despite Robbins telling Bossom several times that he was working on the petition. Moreover, the opposing attorney responded to Robbins' request for information on July 24, 2012, and while Robbins asserts that he followed up with the attorney and his client after receiving Morrison's letter, there is no evidence of any such follow up occurring. The hearing judge also relies on the obvious implications that can be drawn from the long periods of delay in responding to communications from Bossom and ultimate late filing—Robbins had not completed these documents, or likely even started them. Even if the hearing judge did not mention some testimony, "[t]he mere failure to mention a particular fact in its findings, normally is not the equivalent of failing to consider it," and exceptions should be directed as specific

27

finding or express rejection. *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 385 (2001).

Regarding the Complaint, as the hearing judge states, "it was in September 2013 when a complaint was finally drafted by Robert Scanlon, Esq., not Respondent." In fact, it took 14 months from the time when Robbins said filing the Complaint was an "urgent" matter for the Complaint to be filed. As with the Petition for Caveat, Robbins "failed to take any meaningful action to advance Ms. Bossom's matter" between January and September 2013, despite Bossom's repeated requests.

The hearing judge is "not required to mention every evidentiary matter" in the findings of fact. *Id.* at 384. "[I]f there is any competent material evidence to support" the hearing judge's finding, it should not be disturbed. *McDonald*, 437 Md. at 16 (citation omitted). We believe that the above represents competent material evidence supporting the judge's findings and, thus, we overrule Robbins' exceptions.

Robbins excepts to the hearing judge's conclusion that he was not "ready to sue" when he claimed to have been ready. He insists that the judge should better define what is meant by "ready to sue." The hearing judge seems to rely on the fact that, in April 2013, Robbins stated that he was "ready to sue," but did not file any documents until July 2013. The fact that Robbins did not sue when he was "ready," combined with his previous late filing and unreliable assertions that he was in the process of drafting documents, strongly indicates that Robbins was not, in fact, "ready to sue." We reject this exception, as well.

Robbins also takes exception to the judge's characterization of the 2014 invoices he provided to Bossom. He argues that the dollar figures given to Bossom via email on

January 16, 2014 were "just estimates," disputes the hearing judge's interpretation of his claim that he was "writing down" the invoices, and offers his own testimony as support.

If the costs listed in the January 16, 2014 email were "just estimates," as Robbins claims, it is hard to understand why he would have then requested that Bossom send him a check in the amount of those estimates. The $11,000 charge was only an estimate in the sense that Robbins provides absolutely no evidence to support how the charges were calculated, despite having promised to do so on numerous occasions. As the hearing judge noted, Robbins stated that the invoices would be "easy to produce" but never produced them and was still "writing them down" and requesting more money. There is clear and convincing evidence to support the hearing judge's findings, and Robbins merely relies on his own testimony to rebut them. As stated above, this is insufficient, and, we overrule this exception.

Robbins excepts to the hearing judge's characterization of his substitute retainer agreement with Bossom. He states that the retainer agreement was not used for any work or for billing purposes, but, rather, was created for legal malpractice requirements only and was effective for all clients "across the board." Further, he argues that phone logs show calls between him and Bossom wherein they discussed the retainer agreement.

In June 2014, Robbins was granted Power of Attorney over Bossom's affairs for the ostensible purpose of "acting quickly" on certain pressing matters. He used the Power of Attorney to execute another Engagement Agreement, increasing his pay rate to $500 per hour "retroactive to May 22, 2012." To conclude that Robbins' assertions regarding the retainer agreement were not credible, the hearing judge first relied on the fact that there is

29

no indication in Robbins' time logs that he spoke with Bossom about the increased fee or mailed her a copy of the second engagement agreement, despite claiming to have done so. This is especially significant because Robbins had recorded and charged for similar services in the past. Moreover, the hearing judge points to the fact that this fairly significant act was not mentioned in any email and that there is no compelling reason stated as to why Bossom could not have signed the new agreement herself. The above consists of "competent material evidence," *McDonald*, 437 Md. at 16, to support the hearing judge's findings. We therefore overrule this exception.

Robbins also argues that the hearing judge was incorrect when he found that it was improper for Robbins to remain on the case, notwithstanding the likelihood that he would be called as a witness. Instead, Robbins insisted that he intended to withdraw as attorney when necessary. We address this exception in the Conclusions of Law section, under Rule 1.1, Competence.

Finally, Robbins states, generally, that his behavior during his representation of Bossom and interactions with Scanlon have been mischaracterized by the hearing judge. Ultimately, the hearing judge credited the testimony of the other attorneys involved in the case over Robbins' testimony regarding these matters. Because we give "due regard to the opportunity of the hearing judge to assess the credibility of the witnesses," Md. Rule 19-741(b)(2)(B), we overrule Robbins' exception.

*(ii) Exceptions Regarding the Torchinsky Matter*

First, Robbins generally objects to what he refers to as the "inconsistent weight" placed on his phone records. As noted by Bar Counsel, the "factfinder determines the

30

weight of the evidence" presented. *Attorney Grievance Comm'n v. Harris*, 366 Md. 376, 399 (2001) (citations omitted). The weight of phone records is wholly dependent on the reason they are admitted and other evidence presented. We will not disturb the hearing judge's good faith weighing of evidence and, thus, we overrule Robbins' exception.

Additionally, Robbins proffers an exception to the hearing judge's determination that his use of the phrase "flat fee" was a false statement, as opposed to an inadvertent use of language. He argues that he intended to say "estimate." Yet, Robbins does not dispute that he stated, under oath, that he "never produced or worked on any 'flat fee' item" for Ms. Torchinsky, only to reverse himself, again under oath, to reflect that he did perform flat fee work for her. The hearing judge was well within his rights to credit this as a false statement and we overrule Robbins' exception.

Robbins also excepts to the hearing judge's conclusion that Irving Torchinsky "declined" to sign a conflict waiver, as opposed to simply omitting his signature. Again, Robbins disputes the hearing judge's reliance on Robbins' own trial testimony that Irving "signed the [forms] he wanted to sign and declined to sign the ones that he didn't want to sign." This statement, in conjunction with the fact that Irving left the conflict waiver forms unsigned, provides clear and convincing evidence to conclude that Irving "declined" to sign the waiver. Therefore, we overrule this exception.

Finally, Robbins takes exception to the hearing judge's comparison of his statement that Torchinsky specifically instructed him not to send invoices, to supposedly similar statements he made to Bossom and Nutt. According to Robbins, he "never said [Bossom

31

and Nutt] directed that no statements were to be generated . . . ." We believe that Robbins' propounds an incorrect and overly-literal reading of the judge's statement.

The judge's central point was that one of the many reasons he doubted Robbins' truthfulness regarding his claim that Torchinsky requested not to see her billing statement was that he had attributed "similar" statements to "clients in both the Bossom and Nutt matters." Regarding the Bossom matter, Robbins **did** claim that "[Bossom] said in a telephone conversation she didn't want to see [Mr. Scanlon's invoices]," which is clearly a "similar" statement. Moreover, the hearing judge was quite likely referring to the multiple instances of similarly **false** statements regarding other clients' billing statements, as opposed to instances when Robbins made precisely the same statement. We therefore overrule Robbins' exception.

### (iii) Exceptions Regarding the Nutt Matter

First, Robbins objects to the hearing judge's determination that he did not keep Nutt or Ruth Ann Taylor informed of Nutt's bill. Moreover, he states that the financial analysis for Nancy Nutt was always intended to be oral. The hearing judge specifically stated that he did not find Robbins' testimony on this matter credible. The hearing judge may "pick and choose what evidence to believe and what evidence to disbelieve . . . ." *Attorney Grievance Comm'n v. Usiak*, 418 Md. 667, 687 (2011). Not relying on Robbins' testimony was within the judge's discretion, and we overrule Robbins' exception.

Robbins also takes exception to the hearing judge's conclusions regarding his failure to file any income tax returns for Nutt or her trusts in 2013, 2014, and 2015. Robbins states that the returns were never prepared due to the "improper removal of necessary paperwork"

from Nutt's home by her daughter-in-law.  He made the same claim to the hearing judge who found it "unconvincing."  We therefore overrule Robbins' exception.

**Conclusions of Law**

*MLRPC 1.1: Competence (MARPC 19-301.1)*

MLRPC 1.1 requires that lawyers provide competent representation to their clients. The hearing judge found that Robbins violated MLRPC 1.1 in his handling of the Bossom and Nutt matters.  Regarding the Bossom matter, the hearing judge stated that Robbins violated Rule 1.1 when he:

> (i) failed to file a timely Petition to Caveat Ms. Sutherland's Will and failed to take meaningful action to advance Ms. Bossom's case from May 2012 through August 2013; (ii) falsely communicated to her on multiple occasions the status of his efforts on her behalf . . . ; (iii) increased her hourly billing rate effective January 1, 2013, without her knowledge or informed consent; (iv) used the Power of attorney to execute a new retainer agreement (which was also at the higher hourly rate) without authorization and disclosure; (v) acted in a manner that negatively impacted Ms. Bossom's trust in her relationship with Mr. Scanlon through unfounded comments about Mr. Scanlon's integrity; and (vi) failed to withdraw timely as attorney of record, when he knew he would be a necessary trial witness, and failed to advise Ms. Bossom of the problems inherent in his conflicting positions.

As to Robbins' representation in the Nutt matter, the hearing judge concluded Robbins violated Rule 1.1 by: (i) "fail[ing] to file tax returns for her for tax years 2013, 2014, and 2015"; and (ii) "fail[ing] to complete the detailed financial plan from February 2015 until July 2016."

Robbins takes exception to the hearing judge's conclusion that he violated Rule 1.1. Yet, his exceptions are largely a repetition of the arguments made in his exceptions to the

findings of fact. For example, he argues that his actions regarding the retainer agreement were authorized, Nutt's tax returns were not prepared due to the removal of documents from her home, and that he never made false statements. We have already overruled Robbins' exceptions to the findings of fact and need not revisit them.

Robbins also claims that the untimely filing of the Petition to Caveat did not deprive Bossom of any right, lead to "inconsistent positions," or have a negative impact. Even if this were true, "we do not measure an attorney's violation of the Rules of Professional Conduct based on success, or failure to succeed . . . ." *Woolery*, 462 Md. at 233. We generally overrule Robbins' exceptions to these matters and conclude that he violated Rule 1.1 in the Bossom and Nutt matters.

Nonetheless, Robbins excepts to the hearing judge's conclusion that he "failed to withdraw timely as attorney of record, when he knew he would be a necessary trial witness" as a basis for a Rule 1.1 violation in this circumstance. Typically, when attorneys are accused of failing to withdraw from representation due to their necessity as a witness, such behavior is not evaluated under Rule 1.1, but under Rule 3.7. *See, e.g.*, *Attorney Grievance Comm'n v. Dyer*, 453 Md. 585, 665, 670 (2017) (evaluating the lawyers' withdrawal decision under Rule 1.16 and 3.7); *Attorney Grievance Comm'n v. Zhang*, 440 Md. 128, 165 (2014) (evaluating the lawyer's withdrawal decision under Rule 3.7). In this case, Bar Counsel does not charge Robbins with violating Rule 3.7—the proper vehicle for such claims—and cites no cases establishing a "timeliness" of withdrawal requirement for competence. It is not apparent that Robbins' withdrawal to serve as a witness prejudiced Bossom's case in any manner, as other attorneys remained on her case. We sustain

34

Robbins' objection to the hearing judge's reliance on Robbins' "failure to withdraw timely as attorney of record" as a basis for a Rule 1.1 violation in this circumstance.

*MLRPC 1.2: Scope of Representation and Allocation of Authority*
*Between Client and Lawyer (MARPC 19-301.2)*

MLRPC 1.2 requires that a "lawyer abide by a client's decisions concerning the objectives of the representation and, when appropriate, consult with the client as to the means by which they are to be pursued." It also provides that a "lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation," and that a "lawyer shall abide by the client's decision whether to settle a matter." The hearing judge found that Robbins' violation of MLRPC 1.2 was specific to his handling of the Bossom matter.

The hearing judge determined that Robbins violated Rule 1.2 by attempting to "control all relevant decision-making." Specifically, Robbins "viewed the case as 'his case,' not the client's"; "exerted control over communications between Ms. Bossom and Mr. Scanlon"; "attempted to control the settlement of the case"; and "acted inappropriately and unprofessionally in trying to convince Shelba Bossom not to settle on the fourth day of trial."

Robbins excepts to the hearing judge's determination that he violated Rule 1.2. Again, he argues that the judge "failed to make any findings that were inconsistent with Respondent's testimony that he was acting with full knowledge of Ms. Bossom." Moreover, he disputes that Scanlon and Bossom did not have "the ability to communicate at all necessary times." As stated above, we accept the hearing judge's findings on these

35

matters as not clearly erroneous. The client must be appropriately informed to have the "ability to make informed decisions." *Attorney Grievance Comm'n v. Hamilton*, 444 Md. 163, 182 (2015). Robbins' actions prevented this and we overrule his exceptions.

Robbins also states that any conduct occurring in the conference room during the trial happened after he withdrew from the case and, therefore, is "not subject to disciplinary review." Even if he had technically withdrawn as counsel, he should have realized that his statements—made soon after his withdrawal, in the context of formal settlement negotiations, and pursuant to a long-term relationship with the client—were almost certain to appear to her to be made as part of his role as her attorney. In any event, we have disciplined attorneys in the past for violating Rule 1.2 for acts occurring after termination of the attorney-client relationship. *See Attorney Grievance Comm'n v. Sacks*, 458 Md. 461, 494 (2018) (attorney disciplined for actions taken after he was terminated). We therefore overrule this exception, as well, and hold that Robbins violated Rule 1.2.

*MLRPC 1.3: Diligence (MARPC 19-301.3)*

MLRPC 1.3 mandates that a "lawyer shall act with reasonable diligence and promptness in representing a client." The hearing judge explained that Robbins violated MLRPC 1.3 for the same reasons that he articulated in his finding for the violation of MLRPC 1.1 above. The violation of MLRPC 1.3 relates to Robbins' handling of the Bossom and Nutt matters.

Robbins objects to the conclusion that he violated Rule 1.3 because "no violation, prejudicial in nature to a client, has been demonstrated according to the appropriate

standard . . . ." For the reasons stated in our Rule 1.1 analysis, we overrule Robbins'

exception, and conclude that Robbins violated Rule 1.3 in the Bossom and Nutt matters.

*MLRPC 1.4: Communication (MARPC 19-301.4)*

MLRPC 1.4 requires lawyers to communicate with their clients. The hearing judge

concluded that Robbins violated MLRPC 1.4(a)(2), failing to keep the client informed, and

1.4(b), failing to explain a matter to the extent reasonably necessary to permit the client to

make informed decisions, in the Bossom, Torchinsky, and Nutt matters.

The hearing judge explained that Robbins "failed in each case to provide timely

information to the clients about their fees and expenses, thereby depriving the clients of

the ability to make informed decisions about their matters." Robbins took 35 months to

provide Bossom with an invoice, 31 months to provide Torchinsky with an invoice, and 26

to provide one to Nutt.

> Respondent, who is after all a certified public accountant and
> certified financial planner, kept his time contemporaneously
> pursuant to the Timeslips billing program. He is computer
> proficient, and testified that he could easily have produced
> invoices at any time. Indeed, he promised invoices to all three
> clients that were never forthcoming. The invoices, when they
> were provided, covered such extended periods, and were so full
> of minutiae-laden entries, that the clients' ability to understand
> and confirm or refute charges was necessarily hindered.

The hearing judge also found by clear and convincing evidence that Robbins

violated Rule 1.4 (a)(1), (3), and (4), as to his handling of the Bossom matter. He found

that Robbins "misrepresented" the work he performed for her and made "affirmative

misrepresentations or misleading statements" regarding the status of her case. Further, he

explained that Robbins:

37

failed to advise [Ms.] Bossom of his unilateral hourly rate increase; failed to advise her that he had used the Power of Attorney to execute the new retainer agreement; failed to adequately explain the litigation risks (while portraying the case as a "slam dunk") to enable Ms. Bossom to make an informed decision; and, failed to advise her of the problems inherent in serving as her attorney when he was required as a necessary witness at trial.

Robbins excepts to the hearing judge's conclusion that he violated Rule 1.4. Once again, most of Robbins' exceptions are a repetition of the exceptions made to the findings of fact. For example, he repeats his contentions that he provided all requested information to clients, as required by the retainer agreements, and that the new retainer agreement was merely a "back up." We previously determined that the hearing judge's findings on these matters were not clearly erroneous. We therefore overrule Robbins' exceptions and conclude that he violated Rule 1.4.

*MLRPC 1.5: Fees (MARPC 19-301.5)*

MLRPC 1.5(a) provides in part that: "An attorney shall not make an agreement for, charge, or collect an unreasonable amount for expenses." For a fee to be "reasonable," it must be "commensurate with the legal services provided." *Attorney Grievance Comm'n v. Bellamy*, 453 Md. 377, 397 (2017). Factors to be considered in determining reasonableness appear in Rule 1.5(a), subsections (1) through (8).

The hearing judge concluded that Robbins violated MLRPC 1.5(a) in the Bossom, Torchinsky, and Nutt matters. First, he noted that each of Robbins' retainer agreements provided that "the hourly rates of the attorneys, paralegals and administrative personnel who will work on these matters will range from $50.00–$75.00 for administrative

38

personnel, $75.00–$100.00 per hour for paralegals and legal assistants and $350.00 [or $350.00 to $500.00] per hour for attorneys." He concluded that:

> Notwithstanding the language in the retainer agreements, Mr. Robbins, who did not have paralegals, legal assistants or administrative personnel, billed all time at his hourly attorney rate ($350 or $500 per hour) regardless of the task. And while Mr. Robbins testified during his statement under oath that he did not bill his clients for administrative matters, the evidence belies that assertion. Respondent's billing entries routinely include (while frequently blended together with normal attorney tasks) time spent and billed at his attorney rate for routine administrative matters, including for such things as opening mail, filing documents, sending mail, and printing. By charging his attorney rate for these services, Respondent charged unreasonable fees and violated Rule 1.5(a) in each of the three cases.

The hearing judge also concluded that Robbins violated Rule 1.5 "when he failed to provide regular billing invoices for his hourly billings to Ms. Bossom, Ms. Torchinsky, and Ms. Nutt." We have before determined that failing to provide invoices at reasonable intervals upon request or as agreed can violate Rule 1.5, under certain circumstances. *See, e.g.*, *Attorney Grievance Comm'n v. Rand*, 445 Md. 581, 629 (2015) (failing to provide invoices upon request, upon request for replenishment of the retainer, and as provided in the retainer agreement violated Rule 1.5); *Attorney Grievance Comm'n v. Green*, 441 Md. 80, 91–92 (2014) (failing to provide invoices, as agreed upon in the attorney's fee agreement violated Rule 1.5).

Next, the hearing judge determined that Robbins' fees were unreasonable as related to the Bossom matter for two additional reasons. First, even were Robbins' time appropriately billed at the attorney rate, "the hourly rate charged to Ms. Bossom

39

commencing January 1, 2013 was $150 more per hour than she had agreed to pay." The judge specifically noted that:

> Between January 1, 2013 and April 30, 2015, Mr. Robbins billed Ms. Bossom for 415.70 hours of his time, and charged $500 per hour (for a total of $207,850). Had the same number of hours been billed at the agreed rate of $350 per hour, the total would have been $145,495, a material and unreasonable difference of $62,355.

Second, the hearing judge observed that the "bill to Ms. Bossom includes time entries totaling 42.4 hours ($21,200) for the period from April 22, 2015 (the day his notice of withdrawal was filed) through April 30, 2015." These billings relate to a "time when [Robbins] was no longer an attorney in the case and was simply a fact witness."

Regarding the Nutt matter, the hearing judge concluded that Robbins also violated Rule 1.5 by charging "grossly disproportionate" fees. The judge accepted expert testimony to determine that "the fees were substantially greater than the industry norm." The expert criticized Robbins' management fees for Nutt's trust—where the normal trustee management fee would be 2% of the trust corpus, Robbins was charging upwards of 6%.

Robbins excepts to the hearing judge's determination that he violated Rule 1.5. In essence, he again asserts that he provided information as asked and that Maryland Rules do not require regular billing invoices. We rely on the hearing judge's findings, and our previous statements in *Attorney Grievance Comm'n v. Rand*, 445 Md. 581, 629 (2015), to overrule this exception.

Moreover, Robbins states that the hearing judge "fails to explain how the entries outlined in Footnote 59 are anything but necessary and professional in nature." Robbins

mischaracterizes this footnote, as, even if the listed tasks were "professional," they were certainly administrative and should not have been billed at the attorney rate, which was the judge's point. Moreover, exceptions such as these go to the hearing judge's credibility findings, which we have already determined were not clearly erroneous. For these reasons, we overrule Robbins' exceptions and conclude that he violated Rule 1.5.

*MLRPC 1.7: Conflicts of Interest – General Rule (MARPC 19-301.7)*

MLRPC 1.7 mandates that a lawyer "shall not represent a client if the representation involves a conflict of interest." Under Comment 1 to Rule 1.7, "Loyalty and independent judgment are essential elements in the attorney's relationship to a client. Conflicts of interest can arise from the attorney's responsibilities to another client or from the attorney's own interests."

Consequently, the hearing judge found that Robbins violated Rule 1.7 in all three matters. Regarding the Bossom matter, the hearing judge determined:

> [O]n July 1, 2014, Respondent executed the July 1, 2014 Bossom Retainer Agreement using the Power of Attorney. That agreement provided for an hourly rate of $500, retroactive to May 22, 2012. While Respondent claimed that he discussed the rate increase with Ms. Bossom in a telephone call on December 22, 2012 and received her approval, this court found otherwise. Moreover, even if Respondent had discussed the increase with Ms. Bossom and even if Ms. Bossom had orally agreed to the increase, Rule 1.7 required that her informed consent be in writing, or at a minimum, confirmed in writing.

Bar Counsel excepts to the hearing judge's conclusion that Robbins violated Rule 1.7 due to his conduct in the Bossom matter, as opposed to Rule 1.8. According to Bar Counsel, Robbins was not charged with violating Rule 1.7 in the Bossom matter.

41

Consequently, he had no notice, nor opportunity to defend, against these allegations. We sustain Bar Counsel's exception to the hearing judge's conclusion that Robbins violated Rule 1.7 in the Bossom matter and do not adopt this conclusion.

As to the Torchinsky matter, the hearing judge determined that "there was, at a minimum, the risk that Respondent's representation of Irving Torchinsky would be limited materially by his responsibilities to Annette Torchinsky."

> [W]ith knowledge of the family conflicts and dynamics, [Robbins] undertook to represent [Annette Torchinsky's] father, Irving Torchinsky in connection with [her] employment agreement, and in connection with the financial and health care powers of attorney. . . . Indeed, the documents were prepared at Ms. Torchinsky's request in advance of Respondent's meeting with Irving Torchinsky. Respondent recognized the conflict and prepared the parent-child conflict waiver. Yet, upon Mr. Torchin[sk]y's failure or refusal to sign the waiver, Respondent nevertheless proceeded with the representation.

Robbins excepts to the hearing judge's finding that he violated Rule 1.7 in the Torchinsky matter. He states that any conflict was only "potential," and thus did not require a waiver. In any event, he insists the waiver should be implied. Rule 1.7(a)(2) specifically contemplates that a "significant risk" of materially limited representation is sufficient to cause a conflict. We agree with the hearing judge that such a risk existed here and that Robbins' actions indicate that he understood this, too. Robbins' argument for waiver is also unavailing. Given the facts as found by the hearing judge, not signing the form is the only evidence we have of waiver. This is not enough and we overrule Robbins' exception.

42

Finally, concerning the Nutt matter, the hearing judge decided that Robbins violated Rule 1.7 by "pa[ying] himself in his role as trustee, without providing any accounting or oversight, despite repeated requests from Ms. Taylor that he provide information about his charges." *See Attorney Grievance Comm'n v. Hodes*, 441 Md. 136, 193 (2014) (attorney, acting as trustee, violated Rule 1.7 by engaging in self-dealing that had "an adverse impact on his duty of loyalty" to the client and the trust). Accepting the testimony of an expert witness, the judge found that Robbins' "fees to Ms. Nutt included unreasonable charges for routine administrative tasks that were billed at Respondent's attorney rate." Moreover, she might have known about these charges had he provided appropriate billing statements.

Robbins also excepts to the hearing judge's conclusions regarding the Nutt matter. He argues that he met with Nutt frequently and that she believed his fees were reasonable. We overrule this exception, as we accepted the hearing judge's findings of fact on this issue as not clearly erroneous, as described above.

In conclusion, we do not adopt the hearing judge's determination that Robbins violated Rule 1.7 in the Bossom matter because Bar Counsel did not charge Robbins with such a violation. Nonetheless, we agree with the hearing judge's conclusions that Robbins violated Rule 1.7 in the Torchinsky and Nutt matters.

*MLRPC 1.8: Conflict of Interest; Current Clients;*
*Specific Rule (MARPC 19-301.8)*

Bar Counsel takes exception to the hearing judge's conclusion that Robbins did not violate Rule 1.8 in the Bossom matter. Conceding that Rule 1.8 "does not apply to ordinary fee arrangements between client and attorney," per Comment 1, Bar Counsel argues that

43

the Bossom retainer agreement was not an ordinary fee arrangement. Rather, Petitioner states that the fee agreement at issue here was not negotiated at arm's length.

Comment 1 to Rule 1.8 notes that the rule does not apply to "ordinary fee agreements" because such agreements are regulated under Rule 1.5. Moreover, the comment specifies that Rule 1.8 "requirements must be met when the attorney accepts an interest in the client's business or other nonmonetary property as payment of all or part of a fee." Distinguishing "ordinary" agreements from those involving "nonmonetary property" and business interests suggests that the use of the word "ordinary" refers to the type of remuneration provided for in the agreement, rather than the circumstances of its formation. This view is supported by our previous cases. *See Attorney Grievance Comm'n v. Lawson*, 428 Md. 102, 115 (2012) (violation for lien on the client's marital property). We agree with the hearing judge that the Bossom retainer agreement was an "ordinary fee agreement" and appropriately addressed under Rule 1.5. We therefore overrule Bar Counsel's exception and conclude that Robbins did not violate Rule 1.8 in the Bossom matter.

*MLRPC 8.1: Bar Admission and Disciplinary Matters (MARPC 19-308.1)*

MLRPC 8.1 mandates in part that "[A lawyer] in connection with a disciplinary matter, shall not: (a) knowingly make a false statement of material fact[.]" The hearing judge found by clear and convincing evidence that Robbins violated MLRPC 8.1(a) in his representation of Bossom and Torchinsky.

44

Regarding the Bossom matter, the hearing judge found that Robbins violated Rule 8.1(a) when he "knowingly" made false statements that were "related to material facts." These false statements included:

> [H]is letter to Bar Counsel dated October 7, 2015, [in which] Respondent falsely stated that Ms. Bossom had agreed verbally to an increase in his hourly rate, and that Ms. Bossom authorized him to execute the July 2014 Bossom Retainer Agreement. Thereafter, Mr. Robbins falsely stated under oath to Bar Counsel that Ms. Bossom did not want to see Mr. Scanlon's invoices, and that she authorized him to sign the July 2014 Retainer Agreement using the Power of Attorney.

In the Torchinsky matter, Robbins was also found to have made false statements "knowingly[ and] related to material facts" in violation of Rule 8.1(a).

> First, Mr. Robbins falsely stated both in his October 10, 2015 letter to Bar Counsel, and in his statement under oath to Bar Counsel, that Ms. Torchinsky told him that she did not want to see her invoices. Second, in both written correspondence to Bar Counsel and in his statement under oath, Respondent stated that he charged Ms. Torchinsky flat fees for a number of services. He thereafter changed his testimony during the continuation of the statement under the oath and testified falsely to Bar Counsel (and repeated at trial) that throughout the entirety of his representation, he only charged Ms. Torchinksy at his hourly rate of $350 and never performed any work for her on a flat fee basis.

Robbins excepts to the hearing judge's determination that he violated Rule 8.1 on the basis of his exceptions to "each of the factual statements incorporated by the Circuit Court . . . ." We have already affirmed that the judge's factual findings were made by clear and convincing evidence and review some of these findings below.

The hearing judge had clear and convincing evidence to find a violation of Rule 8.1(a). In the Bossom matter, Robbins made false statements regarding invoices. In a letter

45

to Bar Counsel, Robbins stated that "Mrs. Bossom never asked for a single invoice, either verbally or in writing." Yet, in February 2014, Bossom sent an email specifically requesting an accounting from Robbins. Throughout his representation, Robbins continually assured Bossom that invoices were forthcoming, and he stated under oath such invoices would have been "easy to produce." In January 2014, Robbins again stated that he would send invoices in "two to three weeks," though they would not be sent until more than a year later. We agree with the hearing judge that, given all this, it is clear that Robbins knew that Bossom sought invoices and his statement that she did not was false.

In the Torchinsky matter, Robbins stated, under oath, that he "never produced or worked on any 'flat fee' item" for Torchinsky. He later, and again under oath, changed his testimony to reflect that he performed flat fee work for Torchinsky. This again, demonstrated that Robbins knowingly made a "false statement of material fact." Both of these incidents are sufficient to conclude that Robbins violated Rule 8.1(a) in the Bossom and Torchinsky matter. Thus, we overrule Robbins' exception and conclude that he violated Rule 8.1(a).

*MLRPC 8.4: Misconduct (MARPC 19-308.4)*

An attorney has engaged in professional misconduct and violated Rule 8.4(a) whenever he or she is found to have violated the Rules of Professional Conduct. *See Attorney Grievance Comm'n v. Framm*, 449 Md. 620, 664 (2016) ("We have held that, when an attorney violates a rule of professional conduct, the attorney also violates MLRPC 8.4(a).") (internal quotation marks omitted). Additionally, an attorney can violate Rule 8.4 by committing a "criminal act that reflects adversely on the attorney's honesty,

46

trustworthiness or fitness," Rule 8.4(b); engaging in "conduct involving dishonestly, fraud, deceit or misrepresentation," Rule 8.4(c); or "conduct that is prejudicial to the administration of justice," Rule 8.4(d).

The hearing judge concluded that Robbins violated MLRPC 8.4(a), (c), and (d). As the hearing judge concluded that Robbins violated numerous Rules of Professional Conduct, he concluded Robbins violated Rule 8.4(a). Additionally, Robbins "[made] misrepresentations in connection with this disciplinary proceeding, and . . . violated Rule 1.4 in connection with other misrepresentations," violating Rule 8.4(c). "Finally, the court conclude[d] that Respondent's conduct, taken as a whole, and involving multiple misrepresentations, brings the legal profession into disrepute. Such conduct is prejudicial to the administration of justice, and in violation of Rule 8.4(d)."

Bar Counsel takes exception to the hearing judge's determination that Robbins did not violate MLRPC 8.4(b). Petitioner argues that Robbins falsely stated under oath that: (i) "Ms. Bossom did not want to see Mr. Scanlon's bills"; (ii) "Ms. Bossom authorized him to sign the July 2014 Bossom Retainer Agreement"; (iii) Ms. Torchinsky stated that "she did not want to see any invoice"; and (iv) "work done for Ms. Torchinsky was at an hourly rate" and denied the existence of any flat fee agreement or work. These "willfully false" statements, according to Bar Counsel, amount to perjury, under Md. Code (2002, 2012 Repl. Vol.), § 9-101 of the Criminal Law Article ("CR"), and thus a violation of Rule 8.4(b).

We are hesitant to accept such an argument when the attorney has not been charged with a crime, especially when the alleged crime is related to the process of defending

47

oneself from charges by Bar Counsel—like perjury. It is true that we have stated that "a criminal conviction is not required in order to find a violation of Rule 8.4," *Attorney Grievance Comm'n v. White*, 354 Md. 346, 363 (1999) (citation omitted), but, in *White*, we stated this in the context of the hearing judge concluding that Rule 8.4(b) **was** violated. Here, the hearing judge determined that Rule 8.4(b) **was not** violated for the reasons stated above. Giving due weight to the conclusions of the hearing judge, we overrule Bar Counsel's objection and conclude that the hearing judge did not err in concluding that clear and convincing evidence did not establish that Robbins violated Rule 8.4(b).

Robbins excepts to the hearing judge's determination that he violated MLRPC 8.4(a) and (c). Similar to his exception to the Rule 8.1 violation, he excepts to each of the findings of fact in this section that lead to the conclusion that he violated this rule. Again, we overrule Robbins' objection based on the reasoning provided above.

## Mitigating and Aggravating Factors

When assessing the appropriate result in an attorney disciplinary matter, we often refer to the American Bar Association's *Annotated Standards for Imposing Lawyer Sanctions* xvii (2015), which advises the consideration of four questions: (1) "What ethical duty did the lawyer violate?"; (2) "What was the lawyer's mental state?"; (3) "What was the extent of the actual or potential injury caused by the lawyer's misconduct?"; and (4) "Are there any aggravating or mitigating circumstances?"

The respondent in an attorney disciplinary proceeding has the burden of demonstrating the presence of any mitigating factors by a preponderance of the evidence. *Attorney Grievance Comm'n v. Joseph*, 422 Md. 670, 695 (2011) (citation omitted). We

listed common mitigating factors in *Attorney Grievance Comm'n v. Sperling*, 459 Md. 194, 277–78 (2018) (citation omitted).  They include:

> (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to the Commission or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the MLRPC; and (14) unlikelihood of repetition of the misconduct.

The hearing judge determined that Robbins demonstrated that he had never before been disciplined, but this was the only mitigating factor he was able to prove by a preponderance of the evidence.

Bar Counsel has the burden to prove the existence of any aggravating factors by clear and convincing evidence. *Joseph*, 422 Md. at 695 (citation omitted).  The aggravating factors upon which we rely to determine the appropriate sanction were, again, enumerated in *Sperling*, 459 Md. at 275 (citation omitted), and include:

> (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the MLRPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the

Maryland Rules or orders of this Court or the hearing judge; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

The hearing judge found multiple aggravating factors. First, he found that Robbins had a "dishonest or selfish motive" when he profited by withholding information from his clients. Additionally, the three similar instances of misconduct that are the subject of the case constitute a "pattern of misconduct and multiple offenses." Robbins was found to have made "knowingly false statements to Bar Counsel . . . ." Moreover, he "refused to acknowledge the wrongful nature of his conduct," instead shifting blame to others. Importantly, the judge also found that Nutt was a "vulnerable" client due to her old age and dementia diagnosis. Finally, the hearing judge concluded that Robbins had "substantial experience," as he had been practicing law since 1988.

## THE SANCTION

We must now determine the appropriate sanction in such a case. This Court imposes sanctions on wayward attorneys "to protect the public and the public's confidence in the legal profession rather than to punish the attorney . . . [and] to deter other lawyers from violating the Rules of Professional Conduct." *Attorney Grievance Comm'n v. Taylor*, 405 Md. 697, 720 (2008) (citation omitted). Accordingly, the sanction should be "commensurate with the nature and the gravity of the misconduct and the intent with which it was committed." *Id.* Thus, the style and severity of the sanction "depends upon the facts

50

and circumstances of the cases, taking account of any particular aggravating or mitigating factors." *Id.*

Bar Counsel contends that Robbins' professional misconduct combined with the aggravating factors justify disbarment. Indeed, "[w]hen a pattern of intentional misrepresentations is involved, particularly those misrepresentations that attempt to conceal other misconduct by the attorney, disbarment will ordinarily be the appropriate sanction." *Framm*, 449 Md. at 667. As previously stated, Robbins' misrepresentations were made in an attempt to conceal his misconduct.

In *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 511 (2002), we stated that the attorney's behavior was "especially troubling" given that his "chosen prey . . . were the elderly and their families, vulnerable people who sought [the attorney's] assistance in alleviating their difficult circumstances." We reaffirm the *McLaughlin* Court's sentiment and note that Robbins' inclination to prey on the elderly is particularly heinous.

In the present case, we have sustained the hearing judge's findings and conclusions that Robbins violated many rules of professional conduct, including: MLRPC 1.1 (Competence); 1.2 (Scope of Representation and Allocation of Authority); 1.3 (Diligence); 1.4 (Communication); 1.5 (Fees); 1.7 (Conflict of Interest – General Rule); 8.1 (Bar Admissions and Disciplinary Matters); and 8.4 (Misconduct). We disagree with the hearing judge's conclusions of law regarding Rule 1.7 only in that Robbins was not charged with a violation of Rule 1.7 in the Bossom matter. Thus, we do not adopt the hearing judge's conclusion that Rule 1.7 was violated with regard to Bossom.

51

Robbins has demonstrated no compelling extenuating circumstances that would justify a lesser sanction. Consequently, for the reasons provided in detail herein, we hold that disbarment is the appropriate sanction in the present case.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d) FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JONATHAN DAVID ROBBINS.**